82 N.J. 57 (1980)
411 A.2d 168
NEW JERSEY STATE CHAMBER OF COMMERCE, A NON-PROFIT NEW JERSEY CORPORATION, ET AL., PLAINTIFFS-APPELLANTS,
v.
NEW JERSEY ELECTION LAW ENFORCEMENT COMMISSION, AN AGENCY OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS-RESPONDENTS.
The Supreme Court of New Jersey.
Argued May 9, 1979.
Decided February 6, 1980.
Order May 8, 1980.
*59 Frederick K. Becker argued the cause for appellants (Wilentz, Goldman & Spitzer, attorneys; Marvin J. Brauth and Alan M. Darnell on the briefs).
*60 Edward J. Farrell, Legal Counsel, argued the cause for respondent New Jersey Election Law Enforcement Commission (Edward J. Farrell, attorney; Edward J. Farrell and Lisa J. Pollak on the brief).
Erminie L. Conley, Assistant Attorney General, argued the cause for respondent Attorney General of New Jersey (John J. Degnan, Attorney General of New Jersey, attorney).
William S. Singer argued the cause for respondent Common Cause (Fuerst & Singer, attorneys).
Gloria B. Cherry submitted a brief on behalf of amicus curiae, League of Women Voters of New Jersey.
The opinion of the Court was delivered by HANDLER, J.
This appeal presents a constitutional challenge on First Amendment grounds directed to provisions of the New Jersey Campaign Contributions and Expenditures Reporting Act, N.J.S.A. 19:44A-1 to 26, which regulate group efforts to influence legislation. Also challenged is an administrative regulation, N.J.A.C. 19:25-12.1(e), that imposes a minimum expenditure of $100 as a threshold condition for enforcement of these provisions of the act.
Each of the courts below, the Chancery Division and the Appellate Division, had a different view of the breadth of the case. The trial court considered the constitutional attack as encompassing not only those provisions of the Campaign Contributions and Expenditures Reporting Act ("the act" or "reporting act") applicable to individuals seeking to influence legislation but also the act's many other provisions dealing with political campaigns and elections. That court held that the act, with certain exceptions, was in both aspects facially overbroad and consequently contravened the First Amendment to the Federal Constitution. 135 N.J. Super. 537 (Ch.Div. 1975). It also ruled that the administrative regulation imposing a specific *61 monetary threshold as a precondition to enforcement was invalid. On appeal, the Appellate Division held that the trial court had improperly undertaken to decide issues which had not actually been raised, i.e., those provisions relating to political election and campaign activities, and it set aside the trial court's invalidation of this aspect of the act. 155 N.J. Super. 218, 221 n. 1, (App.Div. 1977). Further, the Appellate Division disagreed with the trial court with regard to the statutory provisions governing legislative influence. The appellate court acknowledged that while this part of the act was facially overbroad, this objection could be readily overcome through a narrowing judicial construction, viz, that the act does not apply to persons spending less than $750 in attempting to influence legislation. The court's decision on these grounds thus obviated an additional ruling on the validity of the administrative regulation fixing a lesser monetary threshold.
Plaintiffs come to this Court as of right pursuant to R. 2:2-1(a) and raise several issues on appeal, including an initial contention that they have standing to maintain this action. The major issue presented, however, is whether the provisions of the act designed to regulate conduct seeking to influence legislative action are fatally and irreducibly overbroad under First Amendment precepts. Also questioned is the validity of the administrative regulation calling for enforcement of the act only with respect to such activity involving a minimum expenditure of $100. It is our conclusion that plaintiffs do have standing to pursue this action and, we now hold that, as properly understood and narrowly interpreted, the provisions of the New Jersey Campaign Contributions and Expenditures Reporting Act imposing requirements for reporting and financial disclosure upon persons acting in concert to influence legislation are not unconstitutionally overbroad under the First Amendment to the United States Constitution. We further hold that there is under the act so construed discretionary administrative power to impose a monetary enforcement threshold but that the administrative *62 regulation setting a $100 threshold is too low and is therefore an invalid exercise of administrative authority.

I
Defendants take the position that the plaintiffs lack standing to maintain this action which seeks to have certain provisions of the New Jersey Campaign Contributions and Expenditures Reporting Act declared unconstitutional. The statute, L. 1973, c. 83, N.J.S.A. 19:44A-1 et seq., was enacted in 1973 as a major governmental reform. It regulates campaign expenditures by candidates for political office and imposes a wide range of restraints, including financial reporting and disclosure, upon persons who seek to influence the election of political candidates, the outcome of elections for the passage or defeat of public questions, and the content and fate of legislation.
With respect to individuals seeking to influence legislation, the immediate focus of this appeal, the statute defines "any two or more persons acting jointly ... to influence the content, introduction, passage or defeat of legislation" as constituting a "political information organization." N.J.S.A. 19:44A-3g. It requires that such a political information organization, "before receiving any contribution or expending any money to . . influence the content, introduction, passage or defeat of legislation, appoint one treasurer and designate one depository and file the name and address thereof with the Election Law Enforcement Commission." N.J.S.A. 19:44A-13. "No contributions or other thing of value" can otherwise "be received by a political information organization", nor can any "expenditure ... be made" by such an organization "except through [its] duly appointed treasurer." N.J.S.A. 19:44A-14. Each political information organization must also file a "full report" with the Election Law Enforcement Commission detailing all contributions received and all expenditures made or incurred by it in seeking "to influence" legislation. N.J.S.A. 19:44A-8. This *63 report must also contain the names and addresses of all persons or entities having contributed more than $100 and the names and addresses of persons and groups "to whom expenditures have been made and the amount and purpose of each such expenditure" as well as all receipts and expenditures generated by testimonial affairs. Ibid. If the political information organization also seeks to provide "political information concerning any candidate or candidates for public office or with respect to any public question", N.J.S.A. 19:44A-3g, it must then file another series of reports. N.J.S.A. 19:44A-16b, 19:44A-17, and 19:44A-18. Additional reports must be filed with the Commission by the depository of such organizations whenever a deposit has been made by its treasurer, N.J.S.A. 19:44A-15, and whenever a public solicitation has been authorized by such an organization. N.J.S.A. 19:44A-19. The act does not apply, however, to a "bona fide" representative of the news media in connection with the dissemination of material "in the normal course of its business" or to educational entities conducting classes, educational events, and the like. N.J.S.A. 19:44A-3g. Also excluded from the act's coverage are persons acting alone who expend no more than $100 exclusive of travel expenses. N.J.S.A. 19:44A-14.
The lead plaintiff in this action is New Jersey Chamber of Commerce; other plaintiffs are major trade associations, a labor union local, a private business corporation, a citizens' group, a taxpayer's organization, a sportsmen's federation, and several individuals, two mayors and a husband and wife. Defendants in the action are the New Jersey Election Law Enforcement Commission ("the Commission"), the administrative agency responsible for the act's enforcement, and Common Cause and the State Attorney General, who intervened as parties-defendant. The complaint alleged that each of the plaintiffs in varying capacities had attempted to influence the course of legislation and further intended to do so in the future, and also, that some of the plaintiffs on occasion had attempted to influence the outcome *64 of campaigns on public questions. Consequently, some of the plaintiffs were "political committees" (N.J.S.A. 19:44A-3i) as well as "political information organizations" under the act. The major contention was that the act on its face is violative of the First Amendment to the United States Constitution and our State counterpart, Art. I, pars. 6 and 18 of the New Jersey Constitution (1947). The primary relief sought was a declaration that the act was unconstitutional on its face and in its application to plaintiffs.
Prior to the pretrial conference, the Commission pursuant to its statutory rule-making authority under N.J.S.A. 19:44A-6b, promulgated rules and regulations dealing with a broad range of matters. These included N.J.A.C. 19:25-4.7 which dealt with communications by corporations and labor organizations with stockholders or members; N.J.A.C. 19:25-1.7 restricted the definition of legislation to state-level enactments. The contributions of goods and services were the subjects of N.J.A.C. 19:25-11.4. Another rule, N.J.A.C. 19:25-12.1, exempted from reporting "a political information organization whose expenditures for political activity during the calendar year did not exceed $100.00" exclusive of the "traveling expenses of any member of such political information organization ... if such traveling expenses are voluntarily paid by such member ... without any understanding or agreement ... that they shall be, directly or indirectly, repaid...." Following the promulgation of these rules, plaintiffs filed an amended complaint with the Chancery Division as well as a notice of appeal in the Appellate Division, contending that the Commission had exceeded its rule-making authority and these rules were invalid. The Appellate Division remanded the appeal to the Chancery Division for a disposition of these issues at the trial level together with the issues which the trial pleadings raised.
At the pretrial conference, plaintiffs withdrew their claim that the act was unconstitutional as applied to them; they also conceded that there was a "compelling State interest in the *65 disclosure of expenditures and contributions directed at influencing legislation." Shortly after the pretrial conference, counsel for plaintiffs advised the court that plaintiffs were no longer challenging any of the provisions of the act relating to political committees, whether or not in connection with any campaign or public questions, and that their sole attack was related to the act's effect upon political information organizations with respect to attempts to influence legislation.[1] The matter then proceeded to trial during which plaintiffs concentrated primarily upon their claims relating to First Amendment issues[2] and the validity of the administrative regulation setting the monetary threshold.
*66 Both courts below found plaintiffs had sufficient status to maintain this action. Defendants continue to press the standing issue. They contend that plaintiffs, as lobbyists, trade associations, and special interest groups, regularly undertake to influence the course of legislation and presumably engage in substantial activity and spend considerable sums of money to this end. Hence defendants argue that plaintiffs are not representative of the type of individual citizen who is directly subject to the act, that is, persons who are not otherwise regularly engaged in lobbying, but rather are drawn together spontaneously, frequently over a single issue or cause, and organize into informal, and often temporary, ad hoc groups solely for the purpose of seeking to influence particular legislation. Defendants also assert that no adequate showing of actual injury resulting from the anticipated enforcement of the act was made by plaintiffs even with respect to such unstructured groups of individuals seeking to influence legislation. Consequently, for these reasons, it is urged that plaintiffs lack standing to maintain their action.
Dealing first with the question of constitutional injury or harm, it is recognized that in order to mount a successful overbreadth challenge there must be a strong showing that the "statute's deterrent effect on legitimate expression is ... `real and substantial' ...," Young v. American Mini Theaters Inc., 427 U.S. 50, 60, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310, 320 (1976); see also Bigelow v. Virginia, 421 U.S. 809, 817, 95 S.Ct. 2222, 2230, 44 L.Ed.2d 600, 609 (1975); Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2325-2326, 33 L.Ed.2d 154, 163-164 (1972), and that the sweep of the legislation will impermissibly hobble the exercise of protected First Amendment rights, Buckley v. Valeo, 424 U.S. 1, 69-70, 96 S.Ct. 612, 658-659, 46 L.Ed.2d 659, 716-717 (1976); NAACP v. Alabama, 357 U.S. 449, 462-463, 78 S.Ct. 1163, 1171-1172, 2 L.Ed.2d 1488, 1499-1500 (1958). The prospect of First Amendment harm must be real, not fanciful. Anderson v. Sills, 56 N.J. 210, 220 (1970). On this point, the trial *67 court observed that "[t]he testimony [of several experienced state legislators and others well-schooled in government] uniformly conveyed the view based upon practical political experience over the years that these typical single-issue, less organized groups, upon learning that the act applied to them, would undoubtedly be inhibited or discouraged from engaging in the activity described." 135 N.J. Super. at 547. While recognizing that "the extent of such discouragement is not calculable in advance of some experience under the act," the Appellate Division also concluded that "[t]he evidence warrant[ed] a finding of a cognizable measure of harm to protectable interests." 155 N.J. Super. at 224-225. Despite defendants' characterization of these proofs as essentially "speculative," we are satisfied that such evidence comports with common experience, is reasonably to be believed, and shows a sufficient adverse effect upon First Amendment concerns to indicate constitutional injury.
The further question is whether this constitutional offense is one which plaintiffs are in position to assert as a basis for judicial relief. Entitlement to sue requires a sufficient stake and real adverseness with respect to the subject matter of the litigation. Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107 (1971). A substantial likelihood of some harm visited upon the plaintiff in the event of an unfavorable decision is needed for purposes of standing. Home Builders League of South Jersey, Inc. v. Berlin Tp., 81 N.J. 127, 134-135 (1979); So. Burlington Cty. NAACP v. Mt. Laurel Tp., 67 N.J. 151, 159, n. 3 (1975), app. dism. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975). Here, it may be that plaintiffs, or at least those who are trade associations, special interest groups and the like, and who, by their own pleadings, regularly engage in the business of influencing legislation, do not stand to be affected in the exercise of their First Amendment rights by the enforcement of the reporting act. Indeed, some are probably subject to regulation of their lobbying activities under the Legislative *68 Activities Disclosure Act of 1971, N.J.S.A. 52:13C-18 et seq. Nevertheless, these plaintiffs might well be deemed "political information organizations" under the act here challenged, N.J.S.A. 19:44A-3g, and, it ought not be assumed that any cumulative or incremental regulatory burdens of these two acts would be inconsequential. Moreover, the status of plaintiffs in relation to the reporting act is not that of total strangers or casual interlopers. Plaintiffs, as regular lobbyists, would have an obvious, albeit indirect, interest in the effect upon others of statutory and administrative regulations governing access to the legislative process. Cf. Common Cause v. N.J. Election Law Enforce. Comm'n, 74 N.J. 231 (1977) (Common Cause, whose members are affected by electoral laws, has standing to challenge election law regulations of ELEC). These circumstances adequately demonstrate that plaintiffs have a stake in the outcome of these proceedings and there is genuine adverseness between the parties in terms of the litigated controversy. Crescent Park Tenants Ass'n v. Realty Equities Corp., supra.
In addition to these considerations governing standing to sue, a plaintiff's particular interest in the litigation in certain circumstances need not be the sole determinant. That interest may be accorded proportionately less significance where it coincides with a strong public interest. Elizabeth Federal Savings & Loan Ass'n v. Howell, 24 N.J. 488, 499 (1957) ("`[B]ut slight private interest, added to and harmonizing with the public interest' is sufficient to give standing...." (citations omitted)). In this case, the concerns of the public are weighty. The gravamen of the action is that the New Jersey Campaign Contributions and Expenditures Reporting Act will have a chilling effect upon the First Amendment expressional and associational impulses of a substantial segment of the general citizenry. Thus even were plaintiffs able to show only slight or indirect injury to themselves, the harm to others has been demonstrated and, where First Amendment values are threatened, as here, the ability to assert rights on behalf of others is recognized as a *69 salutary exception to conventional requirements of standing. Broadrick v. Oklahoma, 413 U.S. 601, 610-612, 93 S.Ct. 2908, 2914-2916, 37 L.Ed.2d 830, 839-840 (1973); Anderson v. Sills, supra, 56 N.J. at 220 ("[T]here is good reason to permit the strong to speak for the weak or the timid in First Amendment matters.") This exception has been carved out of the general rule of standing to protect "the transcendent value to all society of constitutionally protected expression...." Gooding v. Wilson, 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408, 413 (1972); see Dombrowski v. Pfister, 380 U.S. 479, 486-487, 85 S.Ct. 1116, 1120-1121, 14 L.Ed.2d 22, 28-29 (1965); Note, "The First Amendment Overbreadth Doctrine," 83 Harv.L.Rev. 844, 853 (1970).
In reaching a conclusion as to plaintiffs' capacity to sue, it is also fitting to measure plaintiffs' status in the case against the essential purposes of the standing doctrine in New Jersey. These are to assure that the invocation and exercise of judicial power in a given case are appropriate. Further, the relationship of plaintiffs to the subject matter of the litigation and to other parties must be such to generate confidence in the ability of the judicial process to get to the truth of the matter and in the integrity and soundness of the final adjudication. Also, the standing doctrine serves to fulfill the paramount judicial responsibility of a court to seek just and expeditious determinations on the ultimate merits of deserving controversies. Plaintiffs, in bringing their complaint in this case, have met these objectives. We thus have no hesitancy in concluding that plaintiffs have requisite standing to maintain this action.

II
The major issue in the case is whether the New Jersey Campaign Contributions and Expenditures Act is unconstitutional under the First Amendment because it is overbroad in its *70 scope and probable application. Where a statute is challenged on First Amendment grounds, the traditional presumption in favor of constitutional validity is not available. See U.S. v. C.I.O., 335 U.S. 106, 140, 68 S.Ct. 1349, 1366, 92 L.Ed. 1849, 1870-1871 (1948) (Rutledge, J., concurring); Thomas v. Collins, 323 U.S. 516, 529-531, 65 S.Ct. 315, 322-323, 89 L.Ed. 430, 439-441 (1945). The assessment of the constitutionality of an allegedly overbroad statute encroaching upon First Amendment interests turns upon whether there is a compelling state interest to be served by the statute and a substantial connection between that compelling governmental interest and the statutory regulation; the compelling state interest must clearly outweigh the "repressive effect" on expressional or associational rights engendered by the application of the statute. NAACP v. Alabama, supra, 357 U.S. at 462-465, 78 S.Ct. at 1171-1173, 2 L.Ed.2d at 1499-1501. Where there is forced disclosure under the statute affecting First Amendment values, as in this case, "exacting scrutiny" of the governmental interest to be served is required. Buckley v. Valeo, supra, 424 U.S. at 64, 96 S.Ct. at 656, 46 L.Ed.2d at 713. See Comment, "Buckley v. Valeo: The Supreme Court and Federal Campaign Reform," 76 Colum.L.Rev. 852, 876 (1976).
In this case, the identification and evaluation of the governmental interest to be vindicated by the reporting act can be drawn from several sources. The act deals in the main with spending limitations upon political candidates and funding relating to political campaigns and elections involving elective public office and public questions. As originally conceived, the act was directed only to these areas of political activity. The New Jersey Election Law Revision Commission, which proposed the adoption of such legislation, recognized the unique role of money in the political arena and took pains to emphasize in its initial report the importance of disclosure of the identity of persons spending money to affect political campaigns. New Jersey Election Law Revision Commission, Interim Report 2 (Sept. 1, *71 1970) ("Disenchantment and perhaps disillusionment with the political process today stems from lack of knowledge of its details, lack of any attempt to force the disclosure of the identity of major participants in the political funding process and lack of adequate dissemination of such information. A veil of secrecy shrouds much of this area."). The bill which was first introduced to carry out the recommendations of the Commission, Senate Bill 1124 (1970), was discussed at public hearings where the importance of money in political campaigns was emphasized, Public Hearings on S. Bill 1124 45-46, 60-61 (Feb. 6, 1973) ("Public Hearings"), and the need for disclosure of the source and amount of monetary contributions was stressed repeatedly. Id. at 4-8, 18, 61-62. The essential purpose of the bill was stated to be one which would reveal the identity of the individuals trying to influence candidates. Id. at 51.
The bill as reported out of the Assembly Judiciary Committee and passed into law contained the added provisions covering legislative influence, which are the subject of the present litigation. It seems evident that the major reasons underlying the statute as originally envisaged, namely, to require the disclosure of the sources and amounts of money used to influence political campaigns, were thought to be equally applicable to the legislative process. Public Hearings, supra, at 41-42, 77, 10A. The statute confirms this. It declares it "to be in the public interest and to be the policy of the State ... to require the reporting of all contributions received and expenditures made ... to influence the content, introduction, passage or defeat of legislation." N.J.S.A. 19:44A-2. The trial court capsulized the clear purposes of the statute, viz:
The manifest objective of the New Jersey Campaign and Expenditures Reporting Act is to identify and attempt to regulate the significant flow of substantial wealth aimed at affecting the outcome of elections, public questions and the legislative process. No one doubts that money is a prime lubricant of the machinery of politics. For too many years the financial aspect of politics has *72 been shrouded either in a veil of secrecy or a fog of confusion. The average voter is aware of the tremendous cost involved in running even a modest campaign for elective office; however, he cannot help but wonder where the money comes from and more importantly ... why it comes. So, too, the legislator is entitled to know much the same information with respect to the motivating forces behind the legislative bills coming before him. See the Legislative Activities Disclosure Act, L. 1964, c. 207, N.J.S.A. 52:13C-1 et seq. Surely an informed electorate as well as an informed legislature constitute the essence of a democratic society. Hence the public policy behind the enactment of the act. [135 N.J. Super. at 544, 343 A.2d at 800]
This vital governmental purpose  to identify and monitor the source and flow of money intended to influence or affect the legislative and political process  has been widely acknowledged. In United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954), the United States Supreme Court sustained the disclosure provisions of the Federal Regulation of Lobbying Act, 2 U.S.C.A. § 261 et seq., as applied to persons seeking to influence the passage or defeat of congressional legislation. The Supreme Court explained the important governmental interest to be served by such legislation.
Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal. This is the evil which the Lobbying Act was designed to help prevent. [347 U.S. at 625, 74 S.Ct. at 816, 98 L.Ed.2d at 1000 (footnote omitted).]
In Buckley v. Valeo, supra, the Supreme Court upheld the constitutionality of several disclosure provisions of the Federal Election Campaign Act of 1971 dealing with the related area of political elections and campaigns for public office. The Court stated that governmental interests may be "sufficiently important to outweigh the possibility of [First Amendment] infringement" *73 and that "[t]he governmental interests sought to be vindicated by the disclosure requirements [of the federal election campaign law] are of this magnitude." 424 U.S. at 66, 96 S.Ct. at 657, 46 L.Ed.2d at 714-715. The Court stressed that disclosure provides the electorate with information to give greater voter insight into the political character of candidates. Ibid. Disclosure requirements also, according to the Court, "deter actual corruption and avoid the appearance of corruption." 424 U.S. at 67, 96 S.Ct. at 657, 46 L.Ed.2d at 715. To the same effect are Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10), 396 Mich. 465, 513, 242 N.W.2d 3, 23 (1976) (hereinafter "Advisory Opinion") ("While requiring lobbyists to disclose information constitutes regulation of fundamental rights, compelling state interest justified such regulation. Both the electorate and public officials have a right to be informed of those interests represented by lobbyists.") and Fritz v. Gorton, 83 Wash.2d 275, 307-309, 517 P.2d 911, 930-931 (1974) (Notwithstanding the importance of First Amendment rights, the general public has a paramount right to information which would help it "evaluat[e] the influence of money upon legislative decisionmaking and related functions of government"; the state's lobbying and disclosure law was designed "for the expressed purpose of fostering openness in ... government ... [and] to exhibit in the public forum the identities and pecuniary involvements of those individuals and organizations that expend funds to influence government."). See also Young Americans for Freedom, Inc. v. Gorton, 83 Wash.2d 728, 522 P.2d 189 (1974); Stoner v. Fortson, 379 F. Supp. 704 (N.D.Ga. 1974); Fortson v. Weeks, 232 Ga. 472, 208 S.E.2d 68 (1974); Note, "The Constitutionality of Financial Disclosure Laws," 59 Cornell L.Rev. 345, 346-349 (1974); cf. State v. Hoebel, 256 Wis. 549, 41 N.W.2d 865 (1950) (lobbying statute is not vague, indefinite or uncertain).
It is the evident purpose of the New Jersey Campaign Contributions and Expenditures Reporting Act to preserve and enhance *74 the democratic political process in both its electoral and legislative aspects by encouraging openness in government. The act strives to ventilate the legislative process through the disclosure of the sources and flow of money designed to impact upon this vital governmental function. It requires public revelation of those who endeavor to control or direct the destiny of legislation through the use of moneys. This, and the ultimate public accountability of legislative representatives who respond to such endeavors, constitute governmental concerns of a compelling magnitude.
Notwithstanding their stipulation that the State interest served by the legislation is of a compelling nature, plaintiffs contend that the act imposes so great a burden on such a wide range of constitutionally protected activities it must be considered overbroad and unconstitutional on its face. They further assert that the act is not susceptible to a narrowing construction which would shrink it to constitutional proportions and therefore the Appellate Division's attempt to do so by the imposition of a monetary enforcement threshold of $750 was legally ineffective.
We can agree with one aspect of plaintiffs' argument. The act would be overreaching if its terms were to be enforced literally and inflexibly. Applied in this fashion, the oppressive effect of the statute on virtually all individuals engaging in nonpartisan as well as political conduct would far exceed the outermost bounds of its legitimate governmental purpose. Cf. New York Civil Liberties Union, Inc. v. Acito, 459 F. Supp. 75 (S.D.N.Y. 1978) (holding New York's disclosure law unconstitutionally overbroad). The trial court found that "[t]here can be little doubt that [the act] ... will have a serious dampening effect upon the outflow of spontaneous expression from the typical single-issue, unstructured political group." 135 N.J. Super. at 549. The Appellate Division agreed that the act would "exert a substantially chilling effect on some groups who collect or spend small sums of money to influence legislation in limited *75 contexts ... whose activities do not substantially affect the public policy underlying the reporting act." 155 N.J. Super. at 231. Accepting then this showing of overbreadth, we reach the resultant, difficult question whether the statute can reasonably be construed in a manner which will overcome its overreaching features.
In appropriate cases, a court has the power to engage in "judicial surgery" or the narrow construction of a statute to free it from constitutional doubt or defect. See, e.g., Broadrick v. Oklahoma, supra, 413 U.S. at 613, 617-618, 93 S.Ct. at 2916, 2918-2919, 37 L.Ed.2d at 840-841, 843-844; United States v. Harriss, supra, 347 U.S. at 618, 74 S.Ct. at 812, 98 L.Ed. at 996-997; Borough of Collingswood v. Ringgold, 66 N.J. 350, 357 (1975), app. dism. 426 U.S. 901, 96 S.Ct. 2220, 48 L.Ed.2d 826 (1976); State v. De Santis, 65 N.J. 462, 472-473 (1974); State v. Profaci, 56 N.J. 346, 349-350 (1970); Schmoll v. Creecy, 54 N.J. 194, 202-205 (1969); Woodhouse v. Woodhouse, 17 N.J. 409, 416 (1955). Cf. State v. Rosenfeld, 62 N.J. 594, 603 (1973) (in absence of ascertainable legislative preference among alternative statutory interpretations, judicial surgery is inappropriate). Although judicial surgery can be practiced in constitutional adjudications, the occasion for its application is not easy to identify or to explain. In Schmoll v. Creecy, supra, this Court framed the question that should properly be answered where a statute apparently contains a fatal constitutional defect: Would the Legislature want the statute to survive? The Court indicated that such an
inquiry cannot turn simply upon whether the statute, if adjusted to the constitutional demand, will cover more or less than its terms purport to cover. Although cases may be found which seem to speak in such mechanical terms, we think the sounder course is to consider what is involved and to decide from the sense of the situation whether the Legislature would want the statute to succumb. [54 N.J. at 202].
The trial court here approached the problem in "mechanical terms," believing that a narrow construction would "cover *76 ... less than [the act's] terms purport to cover." Ibid. It concluded that "[t]he act is too precisely worded" to allow judicial surgery as an interpretive tool. 135 N.J. Super. at 551. The Appellate Division disagreed, as do we, that the act is not susceptible to a judicial interpretation which would mold it to a constitutional conformation. Neither court, however, focused upon the pivotal provisions of the act which, in our view, contribute to its overbreadth threat to First Amendment rights. Specifically, we refer to that section of the act which focuses upon individuals who seek "to influence the content, introduction, passage or defeat of legislation." N.J.S.A. 19:44A-3g; 19:44A-4a. The crucial phraseology, "to influence," is not defined. It is a term with amoebic contours; in normal parlance the word "influence" may be impregnated with a variety of meanings. See Black's Law Dictionary 700 (5 ed. 1979); Roget's International Thesaurus 103 (4 ed. 1977) ("power," "pressure," "domination," "sway," "leverage," etc.); Webster's Third New International Dictionary 1160 (1971) ("producing an effect," "power ... to command belief," "manipulation of authority," etc.). It is the openendedness of this word which engenders the mischief of overbreadth. Without any selective limitation upon its meaning, the statute could well cover persons believed to have an "influence" upon legislation but whose conduct is quite innocuous and who do not have the demonstrated capacity or will to make a tangible impact on the legislative process.
The inquiry becomes whether the Legislature would, hypothetically, countenance a construction of the term "to influence" so as to avoid the application of the act to such persons and rid it of its overbreadth features while still preserving its essence. Schmoll v. Creecy, supra. We believe so.
There are available meanings or definitions of these statutory words which would be constitutionally acceptable. For example, in United States v. Harriss, supra, the United States Supreme Court, as we already noted, sustained provisions of the Federal *77 Regulation of Lobbying Act, 2 U.S.C.A. § 261 et seq. In doing so it reversed the lower court which had ruled that sections 305 and 308 of the act, requiring respectively the reporting of contributions and expenditures of particular sums of money "to influence the passage or defeat of legislation in Congress" and the registration and reporting of paid lobbyists, violated the First Amendment guarantee of freedom of speech. The Supreme Court declared that the key to a proper construction of the lobbying act was section 307 and that section, as found by the Court, limited the coverage of sections 305 and 308 to those persons who solicited, collected, or received contributions with the principal purpose of influencing the passage or defeat of legislation by the Congress. The Court held that, in order to "avoid constitutional doubts," the method of accomplishing the purpose denominated by section 307 must be through direct communication with members of Congress or exhortations to others to communicate directly with members of Congress. 374 U.S. at 620-624, 74 S.Ct. at 813-815, 98 L.Ed. at 998-1000. Cf. Advisory Opinion, supra, 242 N.W.2d at 23 ("[I]n order to avoid manifest overbreadth ... the words `soliciting others to communicate' with an official `for the purpose of influencing legislative or administrative action' must be interpreted to mean express and direct requests to so communicate." (emphasis added)). See also United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 545, 97 L.Ed. 770, 775 (1953); Buckley v. Valeo, 519 F.2d 821, 869-874 (D.C. Cir.1975) aff'd in part and rev'd in part, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); United States v. Nat'l Committee for Impeachment, 469 F.2d 1135, 1140-1141 (2 Cir.1972); N.Y. Civil Liberties Union, Inc. v. Acito, supra, 459 F. Supp. at 85; ACLU v. Jennings, 366 F. Supp. 1041, 1056 (D.C.D.C. 1973) vacated as moot 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975); Note, "Developments in the Law: Elections," 88 Harv.L.Rev. 1111, 1253-1254 (1975). In addition to these judicial perceptions of a satisfactory constitutional meaning *78 of the concept "influencing legislation," common understanding also offers reasonable definitions of the term, definitions which would be more responsive to constitutional demands, i.e., "to influence" as denoting to exert power over others, or to command belief, or to have a dominant effect. Webster's Third New International Dictionary, supra. Further, a more practical and serviceable understanding of the phenomenon of legislative influence, entailing specifically the element of communications with legislators, has also occurred to the Legislature and has been within legislative contemplation. Cf. N.J.S.A. 52:13C-18, 52:13C-20e, and 52:13C-20g (Legislative Activities Disclosure Act of 1971).
Confronted by the unrestrained reach of the literal provisions of the act, we have no compunctions in concluding that judicial interpretation of the crucial terms, "to influence ... legislation," to reach a constitutionally compatible result is called for under all of the circumstances. For one thing, this critical language is fully amenable to interpretative analysis; the terms are not so plain, settled, and unambiguous as to preclude a narrowing, selective judicial construction. Furthermore, there is available a limiting and discrete interpretation of the language which is quite consistent with the principal purpose of the reporting act. Additionally, the Legislature, by the inclusion of the strongly-worded provisions for severability, N.J.S.A. 19:44A-25, has evinced an intent that the continued survival of the statute was an important consideration in its enactment.
Finally, and importantly, we are mindful that this statute was passed after prolonged effort and travail to bring about major political and governmental reforms. It constitutes a singular achievement on the part of the Legislature to further the cause of good government. On this point, we may note the somewhat cynical argument of plaintiffs that some individual legislators purposely intended to pass an unconstitutional statute so that it would be declared invalid by the court. Improper ulterior motives on the part of individual legislators, however, cannot *79 serve to supplant a lawful intent which can otherwise be imputed to the Legislature as a collective body. We can give short shrift to this contention. The judiciary should never become a party to "legicide." It is hard to believe in the total context of "what is involved" and from the "sense of the situation" (Schmoll v. Creecy, supra, 54 N.J. at 202) that the Legislature would willingly suffer the demise of this significant enactment by rejecting a careful and more tailored definition of key provisions which would constrict the expanse of the act so that its promised reforms may remain within constitutional bounds.
We are of the view that a proper constitutional understanding of the type of activity sought to be regulated by the Legislature through the phraseology "to influence ... legislation" is that which has commended itself to other courts dealing with the same constitutional dilemma, e.g., United States v. Harriss, supra; Advisory Opinion, supra; Fritz v. Gorton, supra. Accordingly, we conclude that the meaning to be ascribed to this terminology is activity which consists of direct, express, and intentional communications with legislators undertaken on a substantial basis by individuals acting jointly for the specific purpose of seeking to affect the introduction, passage, or defeat of, or to affect the content of legislative proposals. This understanding, we are satisfied, will not frustrate the underlying intent of the reporting act but, rather, will further it. While it might appear, at least from the literal terms of the act, that the Legislature was bent upon regulating political information organizations with respect to all moneys received and spent to influence legislation, unquestionably the dominant and most important objective of the legislative scheme was to regulate and monitor those likely to have the greatest impact upon the outcome of legislation and to expose the sources and amounts of significant moneys used to affect the legislative process. Construing the terms "to influence ... legislation" in the manner now adopted reaches this salient statutory end. It still leaves unfettered in the exercise of First Amendment freedoms *80 those individuals whose activities would have only an attenuated and less tangible effect on the legislative process. This interpretation, in our view, accommodates the foremost goal of the statutory plan and serves realistically and sensibly to confine the scope of the law to eliminate its excessively farreaching features. So construed, the reporting act is not facially unconstitutional on First Amendment grounds.
The interpretation of the reporting act which we now endorse in effect creates a verbal threshold as a condition for its enforcement with respect to influencing legislation. The act, as construed herein, applies only to persons whose direct, express, and intentional communications with legislators for the purpose of affecting the outcome of legislation are undertaken on a substantial basis. Hence the reporting and disclosure requirements of the act would come into operation only with respect to the receipt and expenditure of significant sums of money used in connection with such communications. It may be that this interpretation of the statute is somewhat lacking in certainty and that conceivably vagueness objections could be raised. However, the statutory standards which we have implied in responding to the overbreadth objections in this case are sufficiently definite, clear, and intelligible to admit of fair and reasonable enforcement. Cf. Joseph E. Seagrams & Sons, Inc. v. Hostetter, 384 U.S. 35, 48-49, 86 S.Ct. 1254, 1263, 16 L.Ed.2d 336, 346 (1966) (the terms "principal and substantial business" in liquor statute were not vague and could be further clarified through administrative regulation); Nevada Cty. v. MacMillen, 11 Cal.3d 662, 672-673, 114 Cal. Rptr. 345, 351, 552 P.2d 1345, 1351 (Sup.Ct. 1974) (The terms "substantial conflict" and "material economic effect" in governmental conflicts of interest statute "are not so uncertain and indefinite as to render the act void on its face."); State v. Lashinsky, 81 N.J. 1, 15-18 (1979); State v. Zito, 54 N.J. 206, 218 (1969). It is not to be anticipated that the statute will be arbitrarily or capriciously enforced, Anderson v. Sills, supra, or that it will not be reasonably applied and *81 clarified by administrative regulation. Joseph E. Seagrams & Sons, Inc. v. Hostetter, supra.
In sum, a narrow and discriminate construction of the key terms of the legislation serves to overcome its major overbreadth objections. The interpretation of the reporting act which we have adopted constricts the reach of the act to persons seeking jointly to influence legislation only through direct, express, and intentional communications with legislators, undertaken on a substantial basis entailing the expenditure of significant sums of money. That interpretation squares the law with constitutional demands and accords with the paramount objective of the Legislature. In so ruling, we are mindful that we have been required to skirt the legislative domain and to deal with issues most properly the concern of the Legislature. We have done so, however, to salvage the Legislature's own product. We recognize that it remains the prerogative of the Legislature to deal more fully and carefully with the vital subject of fashioning appropriate regulations with respect to attempts to influence legislation.

III
Plaintiffs assert that the administrative regulation establishing a monetary enforcement threshold of $100, N.J.A.C. 19:25-12.1(e), is invalid.[3] The focus on appeal shifted somewhat *82 because the Appellate Division ruled that the statute was subject to a monetary threshold of $750 as a result of judicial surgery, thus obviating any further consideration of the validity of the $100 threshold regulation. We have determined, however, that a proper constitutional interpretation of the act calls for the regulation of political information organizations who engage in direct, express, and intentional communications with legislators involving substantial activity entailing the receipt and expenditure of significant sums of money for the purpose of affecting the outcome of legislation. Any judicial manipulation of the statute to impose a monetary threshold would be unnecessary to save the statute from constitutional overbreadth. Hence the Appellate Division's interpretive approach in fixing such a threshold must be set aside. This returns us then to the question raised and decided in the trial court, namely, the validity of the administrative threshold of $100.
The act grants the Commission broad rule-making authority. N.J.S.A. 19:44A-6b provides that "[t]he commission shall promulgate such regulations ... as are necessary to implement the provisions of the [reporting] act." It is uncontrovertible that the Legislature can delegate to the Commission the power to develop and issue administrative rules. See Avant v. Clifford, 67 N.J. 496, 549-554 (1975); Lane v. Holderman, 23 N.J. 304, 319-320 (1957). Administrative regulations, of course, cannot alter the terms of a legislative enactment or frustrate the policy embodied in the statute. See Cole Nat'l Corp. v. State Bd. of Examiners, 57 N.J. 227, 232-233 (1970); Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 528-529 (1964); Abelson's Inc. v. N.J. State Bd. of Optometrists, 5 N.J. 412, 423-424 (1950). Nevertheless, subject to reasonable standards, administrative *83 agencies may be vested with very broad discretion to determine through the exercise of their rule-making powers the appropriate means for executing the policies of the underlying statute and effectuating the legislative intent. See N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 563-564 (1978); State Bd. of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504, 520-522 (E. & A. 1935); Cammarata v. Essex Cty. Park Comm'n, 46 N.J. Super. 262, 269-270 (App.Div. 1957), aff'd 26 N.J. 404 (1958); Gaine v. Burnett, 122 N.J.L. 39, 42-43 (Sup.Ct. 1939), aff'd 123 N.J.L. 317 (E. & A. 1939).
The trial court ruled that the regulation, N.J.A.C. 19:25-12.1(e), contradicts the specific and clearly worded provisions of the act and is thus invalid. 135 N.J. Super. at 550-551, 343 A.2d 796. These provisions, i.e., N.J.S.A. 19:44A-8, 19:44A-13, 19:44A-14, the court believed, called for the operation of the statute with respect to all and any sums of money, presumably even though de minimis or insubstantial amounts were involved. We have reasoned, however, that under the circumstances there must be imputed to the Legislature an intent that the law conform to constitutional dimensions. Hence, consistent with that intent, the act must be understood to regulate certain kinds of conduct which involve substantial sums of money. To conclude otherwise would to reiterate, raise grave doubts as to the constitutionality of the act and attribute to the Legislature a purpose grossly exceeding any legitimate governmental interest in compelling disclosure of those attempting to influence legislation. Moreover, such an unconstrained reading of the act would cast upon the Commission insurmountable enforcement problems. It would not only be rather pointless, it would also be virtually impossible to track the activities of myriad grounds of individuals spending only miniscule amounts of money for the purpose of influencing legislation. Public Hearings, supra at 4A-5A. Under a proper construction of the act, as explained herein, its provisions governing the handling, disclosure, and reporting of monetary contributions and expenditures will come into operation *84 only with respect to political information organizations who exceed the verbal threshold of receiving and expending substantial sums of money.
It is also asserted that the Legislature intentionally chose not to utilize a monetary threshold in terms of defining coverage under the act. This is said to be evidenced by the use of such thresholds in numerous other provisions of the act so that their absence in the sections governing legislative influence by political information organizations cannot be attributed to inadvertence. It may be that the Legislature did not choose to use a monetary threshold as a component of the statutory definition of coverage. It does not follow, however, that the Legislature intended to preclude the Commission from using a monetary threshold as an enforcement tool as long as the essential purpose of the act could thereby be fulfilled. The extent of the Commission's regulatory authority is to be considered in light of the implied as well as express standards of the act. The Commission was understood to have not only the powers, but the responsibility, of promulgating regulations in terms of the spirit of the law. Public Hearings, supra at 70; Public Hearing on the Matter of Proposed Regulations for New Jersey Election Law Enforcement Commission 17 (Sept. 16, 1974). Thus an administrative regulation which serves to exclude from coverage political information organizations which expend less than a prescribed amount of money would not be necessarily or inherently inconsistent with the dominant purpose of the act as properly construed. Cf. Joseph E. Seagrams & Sons, Inc. v. Hostetter, supra.
We do not believe, however, that the threshold amount of $100, as fixed by the Commission in N.J.A.C. 19:25-12.1(e), achieves the legislative aim. The Commission in adopting an administrative threshold of $100 for the purpose of regulating the flow of "significant money" in the area of legislative influence believed that this threshold was itself experimental or provisional. Minutes of Meeting of New Jersey Election Law *85 Enforcement Commission 2 (March 18, 1974). The Commission felt that it might well have imposed a much higher threshold. Minutes of Meeting of New Jersey Election Law Enforcement Commission (Sept. 23, 1974).[4]
The reporting act, as herein construed, does not invade First Amendment rights because it does not cover individuals who are not meaningfully implicated in influencing the legislative process. Rather, it deals only with those who seek purposefully to affect legislation by direct and express communications with legislators, and who undertake to do this in a substantial way, receiving and expending significant sums of money to that end. It was implicit in the thinking of the appellate court, 155 N.J. Super. at 231, that the administrative regulatory threshold of $100 was too low to accomplish such a result. The threshold therefore did not avoid the constitutional risk that persons spending only small sums of money would otherwise be caught up in the reporting act. Ibid. We concur. By fixing a too small monetary threshold, the regulation fails to place correctly the line dividing those who should be regulated and those who cannot be regulated.
The conclusion that the regulatory threshold of $100 is inadequate in terms of the statute means that it must be set aside. However, it devolves upon the Commission, not the courts, to select by regulation a threshold which will serve to cover political *86 information organizations spending substantial sums of money. Of course, the Legislature itself retains the power to deal directly with this difficult subject through clarifying or amendatory legislation. For the present, however, the fixing of an appropriate monetary threshold is a complex and sensitive matter which the Legislature has committed to agency expertise. There is every reason to believe that the Commission will exercise its delegated authority conscientiously and will adopt a monetary enforcement threshold sufficient in amount to constitute adequate protection of First Amendment rights in carrying out the legislative plan. Our ruling invalidating the present regulation, however, will not become effective for ninety days, giving the Commission the opportunity to adopt an appropriate regulation fixing a higher monetary threshold amount consistent with this opinion.
Accordingly, for the reasons expressed, the judgment of the Appellate Division is modified and, as modified, is affirmed.
PASHMAN, J., dissenting.
I respectfully dissent and would hold the act invalid insofar as it imposes organizational and reporting requirements upon "public information organizations."[1] By its own admission, the majority has invaded the legislative prerogative. See ante at 81. It has constructed its own notion of a constitutional enactment while invoking the talisman of "judicial surgery." Such an endeavor must be rejected; a court may never usurp the authority of the elected representatives of the people. Examining what the Legislature has enacted, I am forced to conclude that the statute is substantially overbroad and therefore repugnant to the First Amendment.

*87 I
The goals sought to be furthered by the legislation here at issue are highly commendable and constitutionally permissible. By requiring record keeping and disclosure by public information organizations, the Legislature has attempted to insure that the public will be made aware of the effects money has upon the legislative process. The citizenry can thus intelligently evaluate the performance of elected officials in view of the disclosed activities of lobbyists. See Fritz v. Gorton, 83 Wash.2d 275, 517 P.2d 911, 931 (Sup.Ct. 1974), app. dism., 417 U.S. 902, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974). Such disclosures not only alert the populace to the nature and extent of special-interest group activities, but also help to prevent both corruption and  equally important  the appearance of corruption. As Mr. Justice Brandeis so aptly remarked:
Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants, electric light the most efficient policeman. [L. Brandeis, Other People's Money 62 (National Home Library Foundation ed. (1933))]
Despite its salutary purpose, however, the statute as written is clearly overbroad. Under its terms the organizational and disclosure requirements are applicable to any group which acts in any way to "influence" legislation. Included within its scope are entities ranging from wealthy corporations and large, organized lobbying associations to a husband and wife who send a letter to their assemblyman.
To understand the impact which this legislation has upon small ad hoc groups of concerned citizens, it will be useful to set forth the following example. Assume that a neighborhood group of fifteen homeowners wishes to march in front of the State House in Trenton to display their support for a pending proposal. Under the act, before collecting any contributions or expending any money  for example, to rent a bus or construct signs  this group must appoint a treasurer and designate a *88 depository. N.J.S.A. 19:44A-13. The identities of both must be supplied to the Election Law Enforcement Commission (ELEC). Id. All funds received must be turned over to the treasurer for transfer to the depository. N.J.S.A. 19:44A-15. The treasurer must disburse all monies expended. N.J.S.A. 19:44A-14. The group is required to file a full report with ELEC detailing all contributions received and all expenditures made by the organization in order to influence the legislative process. N.J.S.A. 19:44A-8. It must also file annual reports of all contributions and expenditures, regardless of their purpose. Id.[2] To comply with these requirements, the fifteen homeowners must either keep meticulous records or stay at home. Even without reference to the expert testimony presented in this case, it is obvious that the act's organizational requirements are likely to deter all but the wealthiest and most firmly committed political information groups from publicizing their views.
Not only are such short-term, single-issue groups the most likely to be deterred, they are also the organizations whose actions the State has the least legitimate interest in regulating. Their activities will generally be sporadic and their expenditures insubstantial. It is the organized flow of large sums of money which most needs public revelation, not the incidental expenditures of a group of neighbors or friends interested in making their opinion known on a particular issue. Regulation of such informal yet vital political activity will in fact be counterproductive. Only well-funded, continuing organizations will survive the burdens placed upon them by the Legislature. The voices of small groups of citizens will be drowned out as never before. *89 The statute will preclude legislators from being fully informed on the views of all their constituents. Thus, insofar as the present statute includes such groups within its scope, it fatally lacks "a sufficiently important interest and * * * means closely drawn to avoid unnecessary abridgment of associational freedoms." Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 638, 46 L.Ed.2d 659, 691 (1976).[3] It therefore violates the First Amendment's guarantees of political association and expression. By deciding to the contrary, the majority is permitting "grass-roots" democracy in New Jersey to be stifled.

II
Defendants contend that the regulations promulgated by ELEC save the statute from constitutional infirmity. Specifically, they point to N.J.A.C. 19:25-12.1(e), which provides that any "political information organization whose expenditures for political activity during the calendar year [do] not exceed $100.00," is exempt from the act.[4]
Serious questions exist whether the statute may be upheld only on the basis of a regulation narrowing its scope. I am *90 uneasy with the notion that an administrative agency can by regulation change an unconstitutional statute into a legal act and perhaps back again. Under this view, the statute was unconstitutional until ELEC passed the regulation, and ELEC has the virtual power to render the statute invalid again merely by rescinding its regulation. This curious state of affairs need not be unravelled here, however, for the regulation at issue cannot suffice to free the act from constitutional deficiency.
First, as the majority itself recognizes, see ante at 85, the arbitrary $100 limit established by ELEC is simply too low to distinguish meaningfully between substantial organizations whose activities ought to be revealed and less formal groups whose conduct is of insufficient public impact to justify imposing the heavy burden of compliance with the act. In the example described earlier, unless members paid voluntarily, the mere expense of a chartered bus ride to Trenton would be enough to subject the group to the statute's strictures. The cost of placing a small political message in a newspaper of general circulation would also exceed $100. One can imagine a myriad of other inoffensive activities entailing expenditures above a $100 threshold.
The level of the spending limitations, however, is not the most suspect feature of the regulations. The majority completely ignores the fact that ELEC lacks the authority to create the monetary thresholds contained in N.J.A.C. 19:25-12.1(e). Accordingly, that regulation is of no force and effect; it cannot be utilized to save the statute from invalidation.
Nowhere in the statute is ELEC granted this type of rulemaking power. The relevant language directs as follows:
It shall be the duty of the commission to enforce the provisions of this act, to conduct hearings with regard to possible violations and to impose penalties; and for the effectual carrying out of its enforcement responsibilities the commission shall have the authority to initiate a civil action in any court of competent jurisdiction for the purpose of enforcing compliance with the provisions of this *91 act or enjoining violations thereof or recovering any penalty prescribed by this act. The commission shall promulgate such regulations and official forms and perform such duties as are necessary to implement the provisions of this act. [N.J.S.A. 19:44A-6(b) (emphasis supplied)]
Specifically, ELEC is empowered to:
(1) Develop forms for the making of the required reports;
(2) Prepare and publish a manual for all candidates, committees and political information organizations prescribing the requirements of the law, including uniform methods of bookkeeping and reporting and requirements as to the length of time that any person required to keep any records pursuant to the provisions of this act shall retain such records, or any class or category thereof, or any other documents, including canceled checks, deposit slips, invoices and other similar documents, necessary for the compilation of such records;
(3) Develop a filing, coding and cross-indexing system;
(4) Permit copying or photo-copying of any report required to be submitted pursuant to this act as requested by any person;
(5) Prepare and make available for public inspection summaries of all said reports grouped according to candidates, parties and issues, containing the total receipts and expenditures, and the date, name, address and amount contributed by each contributor;
(6) Prepare and publish, prior to May 1 of each year, an annual report to the Legislature;
(7) Ascertain whether candidates, committees, organizations or others have failed to file reports or have filed defective reports; extend, for good cause shown, the dates upon which reports are required to be filed; give notice to delinquents to correct or explain defects; and make available for public inspection a list of such delinquents;
(8) Ascertain the total expenditures for candidates and determine whether they have exceeded the limits set forth in this act; notify candidates, committees or others if they have exceeded or are about to exceed the limits imposed;
(9) Hold public hearings, investigate allegations of any violations of this act, and issue subpoenas for the production of documents and the attendance of witnesses;
(10) Forward to the Attorney General or to the appropriate county prosecutor information concerning any violations of this act which may become the subject of criminal prosecution or which may warrant the institution of other legal proceedings by the Attorney General. [Id.]
*92 Contrary to the majority's reading of the above provisions, ante at 83, this detailed delegation of power authorizes ELEC to enforce the provisions of the act only as they are written; it does not empower the commission to create dollar thresholds not present in the statute itself.[5]
The majority has not given the slightest indication how the commission's monetary threshold can be conceived as "implementing" the provisions of the act, nor does its opinion even attempt to specify which provisions the regulation supposedly implements. See ante at 82-83. These tasks are impossible because the commission is legislating  not implementing. The majority permits this unjustified exercise of legislative authority as though it believed "agency expertise" were an acceptable substitute for the will of elected legislators.
Even if ELEC did possess broad regulatory power, the dollar threshold would still be invalid. It is well settled that the exercise of administrative power "is of necessity restrained by the declared policy and spirit of the statute and the criteria and standards therein laid down * * *." Abelson's, Inc. v. N.J. State Bd. of Optometrists, 5 N.J.. 412, 423 (1950). See, e.g., Cole Nat'l Corp. v. State Bd. of Examiners, 57 N.J. 227, 232-233 (1970); Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 528-529 (1964); see also Sante Fe Indus., Inc. v. Green, 430 U.S. 462, *93 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); United States v. Calamaro, 354 U.S. 351, 358-359, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957). Because the commission's monetary limitation clearly violates the legislative intent as expressed in the act, it cannot be accorded any legal effect.
The language of the statute is unmistakable. First, the express language of N.J.S.A. 19:44A-8 provides that "each political information organization shall make a full report * * of all moneys * * * contributed to it and all expenditures made, incurred, or authorized by it * * * to influence the content, introduction, passage or defeat of any legislation * *." (Emphasis supplied). The term "political information organization" is defined as "any two or more persons acting jointly * * which is organized for the purpose of * * * or which seeks to influence the content, introduction, passage or defeat of legislation." N.J.S.A. 19:44A-3(g) (emphasis supplied). Special exemptions from the definition are granted only to "bona fide newspapers * * * or other bona fide news medium disseminating political information * * * in the normal course of its business[6] * * *" and schools which conduct classes "in which political information or discussion thereof or comment thereon is an integral part." Id. The statute clearly evinces a legislative intent to require reporting by all groups which act to influence legislation. It is the nature of the activity and not the amount of expenditures which is meant to trigger the reporting mechanism.
Further support for this contention lies in section 14 of the act. That provision declares that no contributions may be received or expenditures made by a political information organization except through its duly appointed treasurer. N.J.S.A. 19:44A-14. The ELEC regulation negates this statutory requirement, for it allows $100 worth of spending before the *94 strictures of the law become applicable. The same section of the statute also provides that single persons acting alone may personally expend up to $100 without reporting such outlays to the commission. Id. This clear distinction between individual and group activity again demonstrates that the Legislature intended to include all groups, regardless of their expenditure level, within the scope of the act.
Finally, the act contains several express monetary limitations. See, e.g., N.J.S.A. 19:44A-16(d), (f), (g) & -18. It is extremely doubtful that the Legislature would have carefully and intentionally placed such clear dollar limitations upon certain aspects of the reporting requirements, while inadvertently and inartfully neglecting to create a blanket exemption for organizations spending only small sums. The history of the bill compels the opposite conclusion. Monetary thresholds were the subject of great debate in both houses. They underwent a number of substantial changes between the Election Law Revision Committee recommendations and the final bill. The conclusion is thus inescapable that the Legislature did not wish to exempt political information organizations whose expenditures fell below a given level.
It is no answer to say that the Legislature would not have intended the act to apply to certain insignificant activities. There is no hint in the act or its legislative history that the commission was empowered to characterize these inoffensive uses by an expenditure limitation.[7] Rather, as previously demonstrated, it was the nature of the activities, and not the amount expended, which was considered critical. Moreover, even assuming the Legislature would not have expected enforcement of the law in certain circumstances, it does not follow that ELEC has the power to promulgate a sweeping exemption. One might assume that the Legislature would not expect the petty *95 larceny statute to be applied to a person who stole 25 cents, yet a local police department could not issue a regulation exempting all such persons from prosecution. In light of the Legislature's clear decision not to utilize monetary thresholds for group activities, ELEC's attempt to do so in N.J.A.C. 19:25-12.1(e) must be declared null and void.[8] For the same reasons, establishment of some higher dollar threshold on remand would also be of no effect.

III
Having demonstrated the invalidity of both the statute as written and the "interpretive" regulation which purportedly saves the act, I now consider whether the statute can be upheld by the use of "judicial surgery." The majority concedes that it is resolving "issues most properly the concern of the Legislature." Ante at 81. This is nothing but an admission that the use of "judicial surgery" here exceeds the proper bounds of the judicial function.
More than mere interpretation is necessary to save this statute. As shown in Part II, supra, the Legislature intentionally decided not to apply a dollar threshold to group reporting requirements. Defendants would validate this defective statute by grafting onto the act an additional qualification which the legislators declined to provide. This task involves judicial rewriting  not interpretation. It would be a judicial transplant  not just minor judicial surgery.
The propriety of judicial alteration of a legislative enactment depends upon two major considerations. First, the court must assess whether the Legislature would prefer that the statute undergo judicial modification rather than be wholly invalidated. *96 See, e.g., Schmoll v. Creecy, 54 N.J. 194 (1969). In this case, as in nearly all, it is probably accurate to say that the Legislature would rather have the Court alter the statute than strike it down. The ends which the act seeks to achieve are of significant public interest. The presumption that the legislators would seek the greatest possible effect consistent with constitutional requirements is a sound one. The statute's unusually detailed severability provision buttresses this conclusion. N.J.S.A. 19:44A-25.
Nevertheless, the requested modification must also meet a second, more demanding test. The action necessary to save the statute must represent an appropriate exercise of judicial power. Since it essentially involves an encroachment upon the legislative prerogative, "judicial surgery" should not be undertaken lightly. This alternative to invalidation should be utilized only after the careful weighing and balancing of several factors.
One of the key considerations is the extent to which the court must intervene to save a statute. Where the court can uphold the enactment by giving its language a narrow interpretation consistent with its purpose, judicial activism is more readily justified. Similarly, if the infirmity can be cured by merely excising a particular sentence or phrase, "judicial surgery" is more appropriate. However, where the necessary modification entails the addition of qualifying language, the court should be extremely reluctant to proceed, for there it usurps the legislative function. This reluctance should be particularly strong in a case like that now before us. As Justice Wachenfeld has reminded us, courts "should not write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment." Craster v. Newark Bd. of Comm'rs, 9 N.J. 225, 230 (1952).
A related criterion is whether the proposed change contravenes the intended purpose of the legislation. Modification is most appropriate where it is in substantial accord with the legislators' overall intent, less appropriate where no real intent is discernible, and impermissible where the judicial alteration *97 would conflict with that intent. See United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). An act which is clear and precise should rarely be rewritten. See Robel, supra; Aptheker, supra.
Before engaging in rewriting, a court should also take into account the number of alternatives available for saving the enactment. Where there is only one viable alternative to invalidation, as in Schmoll v. Creecy, supra, the court should feel relatively free to make that change if in accordance with a legislative preference for survival. In cases where a variety of methods exist for saving the statute, however, judicial modification should be avoided. The choice among several approaches to questions of public policy belongs to the Legislature. A court must respect that prerogative.
The final factor is whether the statute can be made to conform to established standards. Thus in State v. De Santis, 65 N.J. 462 (1974), we saved the obscenity statute from extinction by reading into it the standards previously announced by the United States Supreme Court in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).[9]
First Amendment overbreadth cases generally present a poor setting for "judicial surgery." See, e.g., United States v. Robel, supra; Aptheker v. Secretary of State, supra. In such cases, the chilling effect of the enactment, which may not be fully alleviated by the judicial decision,[10] is of paramount concern. *98 Moreover, in cases involving fundamental individual rights, it is critical that legislators themselves be encouraged to scrutinize with care proposed enactments for constitutional defects. Finally, in First Amendment overbreadth challenges the statute is not given the normal presumption of constitutionality. "Rather, the [United States Supreme] Court has placed the burden of proving constitutionality upon the government once the claim of overbreadth is raised." Note, "Judicial Rewriting of Overbroad Statutes: Protecting the Freedom of Association From Scales to Robel," 57 Cal.L.Rev. 240, 257 (1969); see, e.g., Shelton v. Tucker, 364 U.S. 479, 487-490, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1944).
Under the foregoing principles, it is manifest that "judicial surgery" would be inappropriate in this case. The radical nature of such surgery is exemplified by the majority's "proper constitutional interpretation" of this act, which it concludes "calls for the regulation of political information organizations who engage in direct, express, and intentional communications with legislators involving substantial activity entailing the receipt and expenditure of significant sums of money for the purpose of affecting the outcome of legislation." Ante at 82 (emphasis supplied). According to the majority, saving the statute would necessitate an additional requirement: a threshold of "substantial" or some arbitrary amount of expenditures. As previously discussed, however, the legislative intent was clearly against monetary thresholds for political information organizations  however expressed. Further, the specific terms of the act nowhere contain the "direct contact" limitation supplied by the majority. Even assuming this new standard possesses *99 constitutionally sufficient clarity,[11] the majority has nonetheless directly contravened the legislative will.
Moreover, there are many alternatives which the Legislature could consider in attempting to correct its suspect enactment. Aside from creating a different monetary threshold or limiting the statute's reach to groups who directly contact lawmakers, the Legislature might, for example, exempt all single-issue, ad hoc groups; it might exclude organizations whose primary purpose is not to influence legislation; it might limit the statute to those with a business or commercial interest. Without passing upon the constitutionality of these approaches, it is clear that the Legislature could make alterations in a number of directions. Finally, this case involves a First Amendment overbreadth challenge where the established standards for validity are far from certain. This act therefore constitutes a completely unsuitable candidate for "judicial surgery."

Conclusion
Throughout this discourse, I have attempted to emphasize that the statute in question is fatally overbroad. It cannot be preserved by either ELEC or this Court. The ELEC threshold is invalid because it lacks statutory authorization and is contrary to the intention of the Legislature. In any event, the $100 floor is insufficient to rescue the act from constitutional infirmity. Finally, "judicial surgery" of the radical sort necessary to save the statute would exceed the Court's proper function.
The majority claims that the Legislature would prefer this Court's views on public policy to its own. Based on this suspect *100 foundation, the majority has scuttled established doctrine on the limitations of the Court's function in order to preserve a single statute in a judicially amended form. Neither the reasoning nor the result is acceptable. Accordingly, I would hold the statute invalid insofar as it places organizational and reporting requirements upon political information organizations.
SCHREIBER, J., dissenting.
The trial court, the Appellate Division, and the majority opinion all agree that the regulation of "political information organizations" which distribute and circulate "political information" contravenes the First Amendment. That language is not salvageable by judicial construction without violating the integrity of the statute as a whole.
Courts should exercise the utmost restraint in rewriting legislation to accord with their concepts of what is fair and equitable. If there is any area in which this principle should be applied, it is rewriting legislation intruding upon free speech which occurs as a part of the political process. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964). When political speech is involved, a court's primary function should be to ensure that the Legislature adheres to constitutional limitations. This policy should be followed particularly when the judicial reconstruction itself would restrict political speech. Further, this policy is consistent with the principle that the presumption of validity is not accorded statutes allegedly violative of the First Amendment. See Thomas v. Collins, 323 U.S. 516, 529-530, 65 S.Ct. 315, 322, 89 L.Ed. 430, 440 (1945).
The polestar of the judicial function in construing a statute is to ascertain the legislative intent. The language of the Act as illuminated by legislative history is the best source of that *101 intent.[1] When the judiciary transcends traditional interpretative criteria, it becomes a superlegislature.
The language in the absence of any pertinent legislative history supports only one legitimate construction of "a political information organization" in the New Jersey Campaign Contributions and Expenditures Act. It is intended to apply to all expenditures "[i]n any election at which a public question is to be voted upon," N.J.S.A. 19:44A-4(c), and to all attempts "to influence the content, introduction, passage or defeat of legislation." N.J.S.A. 19:44A-4(a).
The Act defines a political information organization as "any two or more persons acting jointly ... which provides political information ... with respect to any public question, or which seeks to influence the content, introduction, passage or defeat of legislation." N.J.S.A. 19:44A-3(g). Political information includes "any statement[s] ... which reflect the opinion of the members of the organization ... on any public question, or on any legislation, or which contains facts on any such ... public question or legislation whether or not such facts are within the personal knowledge of members of the organization." N.J.S.A. 19:44A-3(h).
The basic requirements imposed on a political information organization may be briefly summarized.
1. It must designate a treasurer and depository. N.J.S.A. 19:44A-13.
2. All expenditures must be made through the treasurer. N.J.S.A. 19:44A-14.
3. Reports of all contributions and all expenditures are to be prepared and filed with the Election Law Enforcement Commission. N.J.S.A. 19:44A-16.

*102 4. Contributions and expenditures are defined as "all loans and transfers of money or other thing[s] of value to ... [a] political information organization" and "all pledges or other commitments or assumptions of liability to make any such transfer." N.J.S.A. 19:44A-3(d) (emphasis added).
5. The term "other thing of value" means "any item of real or personal property." N.J.S.A. 19:44A-3(1) (emphasis added).
6. All funds received must be placed in the depository. N.J.S.A. 19:44A-15.
7. No public solicitations may be undertaken without written authorization. N.J.S.A. 19:44A-19(a). Public solicitation is defined in part to mean any activity whereby the public is personally solicited for cash contributions not exceeding $10. N.J.S.A. 19:44A-3(j). An itemization of the solicitation must be filed with the report if the net proceeds received exceed $100. N.J.S.A. 19:44A-19(b).
A fair reading of the statute evinces a legislative intent of complete public disclosure of financing by two or more persons who distribute or make statements "not limited to, press releases, pamphlets, newsletters, advertisements, flyers, form letters, or radio or television programs or advertisements" which contain facts or opinion on any public question or legislation. N.J.S.A. 19:44A-3(h). The statute declares its policy to be "to require the reporting of all contributions received and expenditures made." N.J.S.A. 19:44A-2 (emphasis added). The provisions of the Act carry out that policy. All contributions and all expenditures are defined to include all transfers of money, all pledges, all assumptions of liabilities and any item of real or personal property. When the Legislature did not intend this broad sweep to apply, it specified threshold limits, such as the $10 provision with respect to solicitation of funds, N.J.S.A. 19:44A-3(j), or the $100 limit on reporting the identity of contributors. N.J.S.A. 19:44A-8. See also other sections of the Act which do not refer to political information organizations, *103 N.J.S.A. 19:44A-7 (amount spent in aid of a candidate shall not exceed $0.50 for each voter in district in last general election in presidential year); N.J.S.A. 19:44A-11 (person must report expenditure in excess of $100 on a political candidate or a public question); N.J.S.A. 19:44A-12 (statement identifying persons contributing over $100 must accompany all deposits); N.J.S.A. 19:44A-14 (individuals need not report their expenditures if not in excess of $100); N.J.S.A. 19:44A-16(d) (candidate must file reports if total amount expended exceeds $1,000, and must report identity of sources over $100); N.J.S.A. 19:44A-16(f) (campaign treasurers need not report identity of contributors who expended $100 or less); N.J.S.A. 19:44A-18 (any person making a contribution or receiving an expenditure in excess of $100 after post election final report shall so advise the Commission).
The intent and purpose of the Legislature reflected in the Act's language are unambiguous. Furthermore, the defendant points to no legislative history which casts a different light on that language. There were no legislative hearings concerning the political information organization provisions. No discussions on the floors of the Senate or Assembly have been produced. Under these circumstances this Court should not, in the guise of interpretation, substantially rewrite this Act.
The United States Supreme Court has refused to rewrite legislation that is unambiguous and violates the First Amendment. Justice Harlan cautioned in Scales v. United States, 367 U.S. 203, 211, 81 S.Ct. 1469, 1477, 6 L.Ed.2d 782, 791 (1961), that "[a]lthough [the Court] will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute."
In United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), the Court struck down a statute which made it unlawful for any member of a Communist organization which *104 was under a final order to register with the Subversive Activities Control Board to engage in employment in any defense facility. The Court held the statute an unconstitutional abridgment of the right of association, and refused to save it by limiting its application to active members who had a specific intent to further the organization's unlawful goals. As Chief Justice Warren explained, quoting from Aptheker v. Secretary of State, 378 U.S. 500, 515, 84 S.Ct. 1659, 1668, 12 L.Ed.2d 992, 1003 (1964), "`[t]he clarity and preciseness of the provision in question make it impossible to narrow its indiscriminately cast and overly broad scope without substantial rewriting.'" 389 U.S. at 262, 88 S.Ct. at 423, 19 L.Ed.2d at 513. Such rewriting would not be undertaken because "[t]he task of writing legislation which will stay within [constitutional] bounds has been committed to Congress." 389 U.S. at 267, 88 S.Ct. at 425, 19 L.Ed.2d at 516. To the same effect see Elfbrandt v. Russell, 384 U.S. 11, 16, 86 S.Ct. 1238, 1240, 16 L.Ed.2d 321, 324-325 (1966).
The arguments against rewriting are especially compelling where the Court has no single peremptory standard to read into and save the statute. Where a number of choices are available, judicial restructuring implicates, in the words of Justice Jacobs, "troublesome policy considerations which should in the first instance be dealt with by our Legislature rather than this Court." State v. Rosenfeld, 62 N.J. 594, 602 (1973). See also Property Owners Ass'n of N. Bergen v. N. Bergen Tp., 74 N.J. 327, 337-338 (1977).
In Rosenfeld, this Court declared unconstitutional that part of N.J.S.A. 2A:170-29(1) which provided that a disorderly person was one who loudly uttered indecent words which were likely to affect the sensibilities of a hearer in a public place. Reversing a conviction under that statute, the Court rejected the State's attempt to save the act by a restrictive construction prohibiting only that "language which would be so grossly offensive to members of the public so as to amount to a nuisance." State v. Rosenfeld, 62 N.J. at 602. The Court observed that such restructing *105 should be avoided because it implicated a number of policy choices. As Justice Jacobs observed, "No purpose would be served by our pursuing the choices available to the Legislature for the policy judgments must rest entirely with it..." Id. at 603.
In this respect, the proposed rewriting in Rosenfeld was unlike that undertaken by this Court in State v. De Santis, 65 N.J. 462 (1974), and Schmoll v. Creecy, 54 N.J. 194 (1969), cases upon which the majority places substantial reliance. In each of those cases the Court had a single compelling standard upon which to rely.[2] In De Santis, moreover, the rewriting was merely a stopgap measure undertaken in the Court's words "[p]ending further legislative action." 65 N.J. at 473.
The majority relies heavily upon United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954). But that case is clearly inapposite. Contrary to the implication in the majority opinion, there the Supreme Court severed one word from an act which was otherwise void for vagueness. The key sentence in the Federal Regulation of Lobbying Act, 60 Stat. 839, 2 U.S.C.A. § 261 et seq., the statute involved in Harriss, was in § 307 of that Act. It provided coverage for any person who received money "[t]o influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States." 60 Stat. 841, 2 U.S.C.A. § 266 (emphasis supplied). The two words deleted were "or indirectly." The Court did not attempt to rewrite the statute with explanatory language.
*106 The majority's unusual construction which applies the Act only to a political information organization which attempts to influence legislation by direct, intentional communications to legislators on a substantial basis invites several observations.
First, the statute recites that the restriction against political information organizations applies "a. [w]henever an attempt is made to influence the content, introduction, passage or defeat of legislation; b. [i]n any primary election for delegates and alternates to the national conventions of a political party; c. [i]n any election at which a public question is to be voted upon by the voters of the State or any political subdivision thereof; d. [i]n any primary, general, special, school or municipal election for any public office of the State or any political subdivision thereof...." N.J.S.A. 19-44A-4. Thus, if two or more persons seek to enlighten the public by disseminating facts on "a public question" in an educational endeavor, without attempting to influence the voter, the group would be a "political information organization." The attempt "to influence" language found in subdivision (a) is absent from subdivisions (b), (c) and (d). The majority's analysis does not refer to these subdivisions, despite their relevance to its interpretation. Presumably these sections have not survived the attack of unconstitutionality. (I note in passing that the plaintiffs' attack as reflected in the pretrial order related "to activities directed at votes on public questions." Such activities would fall within categories (a) and (c)).[3]
The majority opines that the phrase "to influence" is so open-ended that it "engenders the mischief of over breadth." Yet it does not proceed to eliminate that "mischief," but simply circumscribes the area within which those many meanings continue *107 to operate. At 75-76. Thus so long as the influencing is done directly and substantial moneys are expended in the effort, it passes constitutional muster  despite the majority's premise that influence may still have a variety of meanings.
I do not subscribe to the majority's premise, for the only common sense meaning of "influence" in the statutory context is an attempt to cause or bring about a desired result by convincing others, be they legislators or the public, to vote for or against a proposition. No party in this litigation, the trial court and the Appellate Division have had any difficulty with what is intended by the words "to influence."
The only thrust of this law insofar as political information organizations are concerned is disclosure of the amounts expended and the identity of the donors. It is not an attempt to regulate or monitor the donors or recipients except to the extent necessary for disclosure purposes. This may be compared with the regulation and monitoring of lobbyists under the Legislative Activities Disclosure Act of 1971, N.J.S.A. 52:13C-1 et seq.
Next, the construction which limits the Act's applicability to "direct" communications with legislators is not understandable. The trial court, the Appellate Division and this Court have agreed that the invalidity is attributable to the failure to fix an adequate threshold figure to distinguish the special interest groups which expend significant moneys from those that do not. Whether the communication to a legislator is direct or indirect by way of advertisements, radio or television, as the Act expressly contemplates, N.J.S.A. 19:44A-3(h), is irrelevant. The construction adopted by the majority would exclude from the Act's disclosure provisions an expenditure of $100,000 for television advertising to sway public opinion, and thereby indirectly legislators, to support or defeat proposed legislation.
Lastly, the majority's interpretation that the activity be "on a substantial basis" is in itself a vague standard which cannot withstand the constitutional requirement of definiteness needed *108 when proscribing a type of conduct which hitherto had been lawful. This is particularly so where the chilling effect on First Amendment rights is so apparent.[4] The majority leaves it to the Election Law Enforcement Commission to fix the monetary threshold within 90 days. During the interim the Act presumably is effective and, if the Commission does not act within the 90 days, the Act will continue in force with its basic infirmity.
I would reverse and reinstate the trial court's judgment of invalidation with respect to those sections governing political information organizations.[5]
For modification and affirmance  Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, CLIFFORD and HANDLER  5.
For reversal  Justices PASHMAN and SCHREIBER  2.

ORDER
This matter having been duly presented to the Court, it is ordered that the motion for an extension to August 7, 1980, to promulgate regulations in accordance with the judgment of this Court is granted.
NOTES
[1] It was not clear from the record whether plaintiffs were also pressing a claim that provisions of the act dealing with political information organizations seeking to provide "political information concerning any candidate or candidates for public office or with respect to any public question." N.J.S.A. 19:44A-3g, were unconstitutional. As noted, plaintiffs abandoned their attack on the statutory provisions relating to the actions of political committees in connection with public questions. Plaintiffs indicated at the trial level that the thrust of their constitutional attack was upon the sections of the act relating to attempts by political information organizations to influence legislation and this has been the central issue throughout the litigation. We have therefore confined our consideration of the constitutionality of the statute only as it pertains to the conduct of persons endeavoring to influence legislation.
[2] As noted, plaintiffs' original complaint alleged generally State constitutional grounds, N.J.Const. (1947), Art. I, pars. 6 and 18, together with the First Amendment, as a basis for declaring the reporting act unconstitutional. These State constitutional provisions deal with individual expressional and associational rights and the right of citizens to petition their governmental representatives. The State constitutional freedoms, however, were not pursued by plaintiffs as an independent issue in this case, nor was there any decision with respect to this issue by the Appellate Division. It has not been argued or suggested on this appeal, nor does it appear under the circumstances, that a different result would obtain under State constitutional grounds.
[3] Plaintiffs also assert that several other administrative regulations adopted by the Commission during the pendency of the action at the trial level were invalid. Ante at 64. The validity of these regulations was not decided by the courts below. Moreover, it does not appear that the record below was developed for the purpose of testing the validity of these other regulations nor was it made clear that plaintiffs remained interested in that adjudication in light of their primary attack upon the validity of the monetary threshold rule. In addition, our decision today presents a construction of the act which will require the Commission to undertake the adoption of new rules and may prompt the Legislature to take further action. Consequently, we decline to consider or decide the validity of other regulations promulgated by the Commission, it being understood, of course, that claims questioning their validity, both facially and as they may be applied, can be brought by plaintiffs or others adversely affected thereby.
[4] The minutes indicate the Commission considered fixing the threshold at $1,000. The Legislature itself passed a bill, Assembly Bill 3140 (1977), which would have made explicit its intention to utilize a monetary threshold as a definitional standard and enforcement tool and would have placed that figure at $750. The Appellate Division below also believed that a threshold in this amount would accomplish a constitutionally sound result. 155 N.J. Super. at 231. The Governor determined not to approve Assembly Bill 3140 (1970) for the reason that the $750 threshold was not adequate to exclude groups spending insignificant sums of money to influence legislation. Governor's Statement, Assembly Bill 3140 (OCR) (n.d.). This history strongly bespeaks the need for a higher threshold to realize the essential goals of the reporting act.
[1] This suit challenges only those portions of the statute affecting political information organizations. I will therefore not discuss the validity of the remaining sections of the law.
[2] Among other things, the report must include a summary of annual receipts and disbursements, an estimate of the value of other assets and their nature, a list of obligations, debts or loans unpaid at the end of the calendar year, a schedule of all contributions of less than $100 received during the year, and a list, including the names and addresses of the contributors, of all receipts greater than $100. A similar expenditure schedule itemizing all political and lobbying expenses as to recipient must also be submitted. N.J.S.A. 19:44A-8.
[3] No other jurisdiction has such broad political disclosure requirements. Legislation elsewhere either applies solely to "professional" lobbyists, see, e.g., United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed 989 (1954); Advisory Opinion on Constitutionality of 1975 PA 227, 396 Mich. 465, 242 N.W.2d 3 (Sup.Ct. 1974); Fritz v. Gorton, supra, or exempts groups whose expenditures do not exceed a specified limit. See, e.g., Advisory Opinion, supra; Young Americans for Freedom, Inc. v. Gorton, 83 Wash.2d 728, 522 P.2d 189 (1974). Moreover, several of these statutes are explicitly limited to activities involving direct communication with legislators or express exhortations of others to so communicate. See, e.g., United States v. Harriss, supra; Advisory Opinion, supra. The New Jersey statute has no such limitations, nor can ELEC or this Court supply them and remain within their respective functions.
[4] In computing the total amount of such annual expenses, the group may exclude travel costs voluntarily paid by its members. N.J.A.C. 19:25-12.1(e).
[5] The report of the Election Law Revision Commission reaffirms the contention that enforcement was to be ELEC's main function and that it lacks any legislative function. That report states:

It is to be the responsibility of the Election Law Enforcement Commission to supervise and enforce the reporting requirements contained in the act, to prepare forms on which reports will be made, and to disseminate to the public and to the press summaries of all reports filed by candidates and committees. The Election Law Enforcement Commission is also empowered to withhold the issuance of a certificate of election to a candidate who has not complied with the provisions of this act. [Election Law Revision Commission, Report to the Governor and Legislature 4 (1970) (emphasis supplied, footnote deleted)]
[6] Neither the statute nor the regulations provide any standard for determining whether a given newspaper or news medium is "bona fide." Plaintiffs do not, however, challenge this specific provision of the legislation.
[7] It is only by first "imputing" a legislative intent to reach only "substantial sums of money" that the majority can conclude that a dollar threshold is in harmony with the statute's provisions. Ante at 83.
[8] Since I conclude that the statute must be declared invalid insofar as it imposes organizational requirements upon political information organizations, it is not necessary for me to consider the validity of other challenged ELEC regulations, e.g., N.J.A.C. 19:25-1.7, -4.7(c). Moreover, there is no claim that these regulations are themselves sufficient to validate the statute.
[9] It should be noted that we there rewrote the statute for the express purpose of giving the Legislature time to draft a new statute in accordance with Miller. If the Legislature had failed to act within a reasonable time, the Court might have been compelled to eschew its earlier interpretation and invalidate the statute.
[10] Judicial modification of an overbroad statute will not entirely dissipate its chilling effect for the simple reason that there will be persons who are aware of the statute yet not cognizant of the subtle, narrowing judicial interpretation. They will thus be led to forego activities which appear to be covered by the act, even though they have in fact been given a judicial exemption. And as previously noted, the persons who will most feel these effects are those least likely or able to seek expert legal guidance to determine the scope of permissible activity.
[11] The majority itself recognizes "that [its] interpretation of the statute is somewhat lacking in certainty and that conceivably vagueness objections could be raised." Ante at 80.
[1] Other extrinsic aids may be of value in confirming a literally apparent meaning or resolving an ambiguity. Data Access Systems, Inc. v. State, 63 N.J. 158, 166-167 (1973). These aids would include administrative agency construction. Service Armament Co. v. Hyland, 70 N.J. 550, 561 (1976).
[2] The majority also relies upon State v. Profaci, 56 N.J. 346 (1970), in which the Court construed N.J.S.A 2A:170-29(1), to have a dual meaning. In establishing the first prong of the definition, the Court followed the single compelling standard set forth by the United States Supreme Court in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). To the extent that the Court strayed beyond that standard, Profaci was overruled in State v. Rosenfeld, 62 N.J. 594 (1973).
[3] The Appellate Division reversed the trial court's invalidation of statutory provisions as to "political committees" but not as to "political information organizations." 155 N.J. Super. 218, 221 n. 1 (App.Div. 1977).
[4] General standards in a statute may withstand vagueness attacks in areas outside the First Amendment. See Buckley v. Valeo, 424 U.S. 1, 40-41, 96 S.Ct. 612, 645 n. 48, 46 L.Ed.2d 659, 700 (1976) ("[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.") Id. at n. 48 (quotation omitted). Compare Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966) (statute regulating liquor prices was not unconstitutionally vague in defining "related person" to include one whose "substantial business" is the sale of a brand of liquors from the brand owner), with Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (statute punishing those who use "opprobrious words or abusive language tending to cause a breach of the peace" was unconstitutionally vague and overbroad).
[5] See N.J.S.A. 19:44A-25 providing that if "any section, subsection, paragraph, sentence or other part of this act is adjudged invalid, the judgment shall not invalidate the remainder."