78 N.J. Super. 365 (1963)
188 A.2d 616
ETHEL COHEN, PLAINTIFF-RESPONDENT,
v.
GILBERT COHEN AND SIMONE COHEN, HIS WIFE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 1962.
Decided February 25, 1963.
*366 Before Judges PRICE, SULLIVAN and LEWIS.
Mr. Louis Santorf argued the cause for appellants.
Mr. Irving C. Evers argued the cause for respondent.
The opinion of the court was delivered by LEWIS, J.A.D.
Plaintiff Ethel Cohen initiated proceedings in the Superior Court, Chancery Division, to compel a reconveyance to her of certain real estate which she and her husband, Jacob Cohen (now deceased), had previously conveyed, as hereafter noted, to two of their sons. The trial court granted the relief sought in the complaint, and the defendants Gilbert Cohen and his wife, Simone, appeal.
The factual complexities in this case reveal a situation that is pathetic, to say the least. We canvassed the complete record and here recite only the details essential to our consideration of the crucial issues.
There were eight members of the Cohen family  the mother, Ethel; the father, Jacob; four sons and one daughter now living, Gilbert, Morris, Manus, Henry and Anna Germann; and a deceased son, Samuel. Gilbert and Morris were handicapped. The former had been afflicted since early childhood with Pott's disease (a form of spinal tuberculosis with secondary spastic paraplegia). He was confined to bed until reaching the age of 27 years, but is now able to ambulate with the aid of a wheel chair and he has learned to operate an automobile. At the age of 34 years he married Simone. Morris is the victim of poor health; he is "very ill with mental diseases, he has been in and out of Greystone three or four times."
*367 On February 19, 1958 Ethel and her husband Jacob transferred by deeds the following properties:
 to Gilbert a one-half interest in premises 60 Market Street (Gilbert at the time was a common tenant as to the remaining one-half);
 to Gilbert and his wife Simone the premises at 201 President Street;
 to Gilbert and Morris and their respective wives the premises at 222-224 Monroe Street;
 to Morris and his wife Sharon the premises at 247 Monroe Street.
All of the said properties are situate in Passaic, New Jersey, and the interests conveyed were owned by the grantors as tenants by the entireties except the President Street property, which was in Ethel's name. A life interest in the net income therefrom, in each instance, was retained and reserved by the grantors or the survivor of them. The legal documents to effectuate settlement were drafted, and their execution supervised, by one August C. Michaelis, a member of the New Jersey Bar since 1940. He had known Ethel and Jacob for 10 or 12 years and during that time had represented them in legal matters "approximately seven times." One of the controversial exhibits submitted in evidence was a signed and notarized instrument containing a series of questions he propounded to the grantors and their replies thereto affirming an understanding of the transaction and their voluntariness in its consummation. The explanation of this unusual procedure is best stated in counsel's own words. He testified:
"Q. What was the purpose of it?
A. The purpose of it was to avoid any question in the future, to make definitely sure between ourselves that this was exactly what they wanted to do, and to have a record.

* * * * * * * *
Q. Will you tell the Court what you had in mind?
A. Well, these were elderly people who I may say were very astute and were fully apprised of what was transpiring. In prior discussions with them, I understood the feeling between themselves and some of their children; and to avoid any question of any kind I went through it fully before I even drew the deeds, to make sure in my mind that this is exactly what they wanted; because, if I may say so, four *368 years prior I drew a will for the two of them, and the property in these deeds went exactly as their will four years prior had indicated. And I wanted to make sure that they knew exactly what they were doing.

* * * * * * * *
Q. Explain to the Court what circumstances there were about this incident in drawing these deeds that was different from any you have had in twenty years at the Bar.
A. Firstly, I knew of the feeling between the children. I also knew from Mr. and Mrs. Cohen of their personal feelings toward certain of their children. We had gone through that many, many times. We had gone through that in 1954 when she did not want to leave a thing to certain of her children because, as she said, one of them had not seen her in five or six years; they did not care whether she lived or died. The only ones she was concerned about were Gilbert and Morris.
Be that as it may, when they came in to my office on the 19th of February, it was their absolute and unequivocal desire to give this property outright, absolutely outright, and I prevailed upon them not to do it. I prevailed upon them to keep a life interest in this property so that they would be independent, so they would not be dependent on any of their children for support and maintenance, and that is why I went through the questions and answers, to make it quite clear in the future that they were reserving unto themselves a life interest and the net income from all of this property. That is why I did it in this particular case." (Emphasis supplied.)
In mentioning the year 1954 Michaelis referred to the time he drafted last wills and testaments for Ethel and Jacob Cohen. His testimony, that the disposition of their real estate by deeds in 1958 was consistent with their testamentary disposition of the same properties to the same parties in 1954, was uncontradicted.
Within a week prior to the execution and delivery of the aforesaid deeds, Ethel had consummated note transactions in the amount of $10,000, representing loans for the benefit of her sons Henry, Manus and Morris, involving the Passaic Paint Service, Inc., a corporation which those three sons controlled. Shortly thereafter (April 14, 1958), Henry obtained a loan of $1,000 from his mother, and Manus on May 13, 1959 negotiated from her a personal loan of $500. It is now claimed by Henry and Manus that plaintiff did not know what she was doing when she signed checks and accepted *369 notes evidencing the several loans in which they engaged their mother.
At the time of the contested conveyancing (February 19, 1958), Ethel and Jacob were living together in their home at 201 President Street. On May 2, 1958 they went to live with their son Gilbert. Jacob died August 27, 1959 and the mother continued her residence with Gilbert until February 6, 1960, when she was taken to the Miriam Barnert Old Age Home (sometimes referred to as the Daughters of Miriam Home). She stayed there only two days, when her son Manus prevailed upon her to live with him. In less than a month thereafter the present suit was instituted. The complaint was filed March 8, 1960 and at that time plaintiff was 78 years of age.
Depositions of the plaintiff were taken on June 7, 1960. Certain interrogations and answers were most revealing:
"Q. Do you know that you are suing Gilbert?
A. I am suing Gilbert?
Q. Yes.
A. No.
Q. You don't know that you are suing him?
A. No. Yes?

* * * * * * * *
Q. You tell me why.
A. I don't know.

* * * * * * * *
Q. Just to bring it to a head, as far as you know, you are not suing Gilbert?
A. No, I don't sue Gilbert.
Q. Do you want to sue Gilbert?
A. What for? I don't want to sue him.

* * * * * * *
Q. What property did they take away?
A. I don't know.
Q. Did you have some property?
A. A little, not much.
Q. Who took it away?
A. I don't know."
The trial commenced on September 19, 1961 and consumed four days. Plaintiff was most fluently conversant with the *370 Yiddish language and her examination while on the witness stand was through a court interpreter. Her mental condition was apparent:
On Direct:
"Q. How old are you, Mrs. Cohen?
A. (Through the interpreter) I can't remember. My children.

* * * * * * * *
Q. Why are you taking your shoe off?
A. (Through the interpreter) Because when I go to sleep, you know.

* * * * * * * *
Q. Do you know what the words last will and testament mean?
A. (Through the interpreter) Yes.
Q. What?
A. (Through the interpreter) I don't know."
On Cross:
"Q. Do you know you are suing your boy Gilbert?
A. (Through the interpreter) Why?
Q. Do you know you are suing him today?
A. (Through the interpreter) I don't know. I can't.

* * * * * * * *
THE COURT: Ask her this question: Do you own any houses, Mrs. Cohen?
THE INTERPRETER: She said: That is what I own.
THE COURT: What?
THE INTERPRETER: Indicating her shoes."
On Redirect:
"Q. Mrs. Cohen, who is this?
A. (In English) I think it is Linda.
Mr. Kohlreiter [her trial counsel]: For the record, I would like it indicated that the person I directed my question about was her son Manus.
Q. Mrs. Cohen, who is this?
A. (In English) This is Manus.
Mr. Kohlreiter: May the record indicate that the witness identified the son Henry as Manus."
At one point in the examination of plaintiff, the court observed, "I am wondering how long this has to go on. I should think that the children should be ashamed of themselves to have brought this case into court. To expose their mother to a spectacle like this is outrageous. How long does this have to go on? * * * It is disgraceful."
*371 Herman H. Singer, who signed the summons and complaint as counsel, was called as a witness by plaintiff's attorney. His testimony left much to be desired in factual clarity and exactness. It is manifest, however, that he had represented Henry Cohen for at least five years, and that the first time he met plaintiff was at the home of Manus "right after she [plaintiff] got out of the Daughters of Miriam [February 8, 1960]." On the occasion of his first conference, he arranged for an interpreter (Ralph Wolff) to be present and requested him "to ask her what she wanted" with respect to her desires and wishes in the drafting of a last will and testament. On a subsequent date Manus took his mother to Singer's office for the execution of the will, at which time Wolff was also present. The testamentary document was signed by Ethel and at least one witness. Singer was not certain if he had witnessed it. His testimony under cross-examination is significant:
"Q. As a member of the Bar and attorney at law drawing a last will and testament of this woman, from what you observed, did this woman understand the desires and intention that were expressed in that will? * * *
A. My own observation, no, she did not know.
Q. She did not know?
A. No."
On redirect the trial judge interpellated:
"THE COURT: You drew a will believing that the woman was incapable and then had her come and sign it, witnessed her signature and the signature of the other witness, and then did not sign it yourself?
THE WITNESS: That is correct.
THE COURT: Why?
THE WITNESS: Because at that time I thought she was absolutely incapable.
THE COURT: By whose authority was the will destroyed?
THE WITNESS: My own. I told Mr. Cohen [Manus] the following day to bring his mother to my house, and I told him to tell her that I thought she was incapable of signing the will, and I asked him to give it to her to tear up, and it was destroyed the next day. I did not think the woman was capable of knowing what she did."
*372 When defense counsel questioned Singer concerning the complaint, he responded:
"Q. Without having anyone appointed a guardian or anyone to take care of her business, you did file this complaint, did you not, in her name alone?
A. Yes.
Q. Did you get the facts from her?
A. No, I got them from Ralph Wolff.
Q. May I have the answer, did you get the facts from her?
A. No. I couldn't speak to her.
Q. Did you address to her questions through an interpreter?
A. That is correct.
Q. Did you get responses through the interpreter?
A. That is correct.
Q. And based upon the facts that she gave you, you filed this complaint?
A. That is correct.

* * * * * * * *
Q. My question was: Did she respond to you through Mr. Wolff according to what you were asking of her?
A. Yes.
Q. So I will ask you this on direct, as a member of the Bar, from your observation, were you of the opinion that she understood what was being addressed to her and understood the material facts that you allege in this complaint?
A. At that time, yes. At that time, I had Mr. Wolff there. Yes."
Ralph Wolff was not produced as a witness.
We are not satisfied from the record that the plaintiff was mentally competent during the trial, at the time her depositions were taken or when the pending litigation was commenced in her name. Under N.J.S. 2A:15-1 "every person of full age and sound mind may prosecute or defend any action in any court," and as provided by our court rules an incompetent person "shall be represented in an action by his guardian appointed in this State" or "by his guardian ad litem appointed by the court." R.R. 4:30-2.
There were compelling indications throughout the proceedings that Henry and Manus were in reality the moving litigants. A parent, aged and mentally incompetent, was apparently enmeshed as a plaintiff, against two of her children, in a lawsuit she was incapable of comprehending. We note *373 that defendants Morris Cohen and his wife Sharon effected a reconveyance to plaintiff of the properties they received and that the instant suit was discontinued as to them. There were strong factual imputations, however, that this may have been accomplished through economic pressures upon Morris (ill as aforestated) instigated by Henry and Manus, with whom Morris was associated in business. Morris was not called to the witness stand.
The evidence of plaintiff's non compos mentis condition was plethoric. Her demonstrations in open court and the testimony there elicited were sufficient to have required sua sponte an adjournment of the trial until an impartial guardian or guardian ad litem had been appointed, the entire subject matter investigated, and the pleadings appropriately amended.
The proofs before us do not support a conclusion that defendants exerted any undue influence or deception or that independent advice had been withheld from the plaintiff. The "improvident gift" rule is not applicable because the trial court specifically found that "the proof offered on behalf of the defendant Gilbert Cohen, indicated that the plaintiff retained a sizable estate in bonds, stock and moneys on deposit in various banks." Moreover, the conveyances under attack were by Jacob Cohen and his wife Ethel. There were no findings of fact by the court as to Jacob. Parenthetically, it should be noted that there may have been legitimate and substantial tax advantages to plaintiff in consummating inter vivos gifts of real estate to her intended testamentary beneficiaries subject to retention of an income interest for life.
It is clear, however, that Gilbert collected rents and managed financial affairs for his mother, and in general occupied a position of confidence. He is legally obliged to render an accounting with respect to his fiduciary responsibility and as a transferee of property there is a presumption adverse to him.
The prevailing rule in this State has been repeatedly expressed in our decisions. It is:
*374 "In all transactions between persons occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, is presumed, or in fact reasonably exists, the burden of proof is thrown upon the person in whom the confidence is reposed, and who has acquired an advantage, to show affirmatively, not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood." Hall v. Otterson, 52 N.J. Eq. 522, 528 (Ch. 1894), affirmed 53 N.J. Eq. 695 (E. & A. 1895).
See, in particular, Mott v. Mott, 49 N.J. Eq. 192, 198 (Ch. 1891); In re Fulper, 99 N.J. Eq. 293, 302 (Prerog. 1926); Podkowicz v. Slowineski, 44 N.J. Super. 149, 155 (App. Div. 1957), certif. denied 25 N.J. 43 (1957). In meeting this burden, however, defendants are entitled to be confronted with a competent plaintiff or, in case of incompetency, with a court-appointed guardian concerned primarily with the rights and interests of the incompetent.
Our courts have always been zealous to safeguard the personal and property rights of incompetent parties. Borough of East Paterson v. Karkus, 136 N.J. Eq. 286, 289 (Ch. 1945).
The judgment of the trial court is vacated and the matter remanded with directions that (1) a disinterested guardian or guardian ad litem be appointed to represent the plaintiff Ethel Cohen; (2) such court appointee, prior to any further proceedings in this action, make an independent investigation and determine the rights of plaintiff and the advisable procedure for her protection; (3) if in his judgment, after such investigation, the pending action should be continued, the complaint be appropriately amended, and (4) all further proceedings be conducted under the direction of the trial court.