180 N.J. Super. 406 (1981)
434 A.2d 1155
IN THE MATTER OF ALICE BENNETT, AN ALLEGED MENTAL INCOMPETENT.
Superior Court of New Jersey, Law Division Probate Part, Monmouth County.
Decided February 23, 1981.
*407 Priscilla Feagles Koch, for plaintiff (Protective Services for the Elderly, attorneys).
Lawrence M. Lawson, for movant Harold Bennett.
James J. Cleary, guardian ad litem (Yacker, Granata & Cleary, attorneys).
YACCARINO, J.S.C.
This matter came before the court on a notice of motion for an order vacating the judgment of incompetency of Alice Bennett *408 on the grounds that this court is without jurisdiction to grant such an order by reason of plaintiff's lack of standing.
The material facts may be stated as follows:
On August 29, 1980 plaintiff Protective Services for the Elderly, located at 191 Bath Avenue, Long Branch, New Jersey, filed a complaint seeking to have Alice Bennett declared incompetent as a result of unsoundness of mind. Plaintiff also sought the appointment of a guardian of her person and property.
Plaintiff alleged that it had an interest in the action by reason of its status as an agency funded from the Office on Aging through Family and Children's Services to protect the frail elderly in Monmouth County who are in need of crisis intervention. Plaintiff's involvement stemmed from a request by the Monmouth County Board of Social Services, Freehold, New Jersey, to provide protective services to Alice Bennett, who had been found wandering in the streets of Belmar, New Jersey.
Pursuant to statute and court rule, this court conducted an incompetency hearing and, upon the basis of the testimony of Dr. Carlos A. Perosio and Alice Bennett, declared her to be incompetent.
Alice Bennett is 82 years old. She has two grandsons, the movant Harold Bennett and Francis Broda, and a niece Barbara Chase.
Neither the present statute, N.J.S.A. 3A:6-35, nor the applicable court rule, R. 4:83-1 et seq., defines standing. The answer lies in history.
The authority of the early Chancellor in England to conduct proceedings of this kind did not exist by virtue of his office or as part of his general extraordinary jurisdiction. The power was derived by special authority from the sovereign in whom, as parens patriae, the care of idiots and lunatics was vested. Bispham's Principles of Equity (6 ed. 1899), 677; 4 Pomeroy's Equity Jurisprudence (5 ed. 1941), § 1311 at 883. The King delegated his authority over such persons to the Chancellor by *409 means of an official instrument called a "sign manual." Bispham, supra; Pomeroy, supra. Originally the effect of the delegation was merely to give the Chancellor the power to grant the custody of the lunatic, "but after the Court of Chancery became well established, successive holders of the great seal imported into the exercise of their special jurisdiction under the sign manual all the powers which they wielded as chiefs of the Court of Chancery" (emphasis supplied). Bispham, supra. See, also, 4 Pomeroy, supra, § 1312 at 884: "The proceedings in which this jurisdiction is exercised (in England) are substantially as follows: Some friend of the alleged lunatic addresses a petition to the Chancellor personally, or other judge in lunacy...." (Emphasis supplied.)
On November 21, 1794 the people of this State granted the administration over lunatics to the Chancellor, who was at that time also the Governor. Paterson's Laws 125. The act provided that the Chancellor should have the care of idiots and lunatics and provided for the safekeeping of them and their lands and tenements, goods and chattels, that they and their households might be supported, that no waste or destruction should come to their property, and that in case of their recovery their estates should be restored to them; otherwise at their deaths should go to their heirs or next of kin. Subsequent revisions and codifications conferred jurisdiction in the Court of Chancery.
Although no such language exists in the present statute, as early as 1820 our statutes specified that the practice in incompetency proceedings would be "as heretofore." The prior statute, R.S. 3:7-35, provided that "except as otherwise provided by law, the question whether a person is a mental incompetent shall be determined by an inquest upon a commission to be issued out of the Court of Chancery and returnable thereto, and proceedings thereon shall be as heretofore practiced in proceedings de lunatico inquirendo and in the nature of de lunatico inquirendo."
The reference to "as heretofore practiced" is doubtless that which existed in the Court of Chancery of England. Comfort's Case, 66 N.J. Eq. 6, 7 (Ch. 1904).
*410 Notwithstanding In re Tierney, 175 N.J. Super. 614 (Law Div. 1980), affirmed 177 N.J. Super. 245 (App.Div. 1981); In re Schiller, 148 N.J. Super. 168 (Ch.Div. 1977) and In re Oswald, 132 N.J. Eq. 325 (Ch. 1942), to the contrary, the practice in England did not limit standing to relatives and creditors of the alleged incompetent. This court, as a court of equal jurisdiction, is not bound by the holdings of the above noted decisions. Further, having found no appellate division decision addressing this issue, this court now holds as a matter of law that there are no special rules of standing governing incompetency proceedings. General principles of standing therefore apply.
It cannot be disputed that New Jersey courts will not entertain proceedings by plaintiffs who are "mere intermeddlers" (Baxter v. Baxter, 43 N.J. Eq. 82, 86 (Ch. 1887), aff'd 44 N.J. Eq. 298 (E. & A. 1888), or are merely interlopers or strangers to the dispute (Bergen Cty. v. Port of New York Auth., 32 N.J. 303, 307, 318 (1960)). Our courts have confined litigation to those situations where the litigants' concern with the subject matter evidenced a sufficient stake with real adverseness. Crescent Park Tenants Ass'n v. Realty Eq. Corp. of N.Y., 58 N.J. 98, 107 (1971). Due weight is given to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of just and expeditious determinations on the ultimate merits. Crescent Park, supra, citing Tumarkin v. Friedman, 17 N.J. Super. 20, 21 (App.Div. 1951), certif. den. 9 N.J. 287 (1952); Handelman v. Handelman, 17 N.J. 1, 10-11 (1954). Thus a plaintiff's particular interest in the litigation in certain circumstances need not be the sole determinant of standing. N.J. Chamber of Commerce v. N.J. Elec. Law Enforcem. Comm'n, 82 N.J. 57, 68 (1980). That interest may be accorded proportionately less significance when it coincides with a strong public interest. Id., citing Elizabeth Federal S. & L. Ass'n v. Howell, 24 N.J. 488, 499 (1957).
The increasing interest and awareness by the public and all levels of government in problems faced by the elderly cannot be *411 disputed. Agencies have been created and funds for assistance made available.
The Court of Chancery also has constitutional jurisdiction over the subject matter by virtue of N.J.Const. (1947) Art. VI, § III, par. 2, and the November 7, 1978 amendment thereto. The constitutional amendment adopted by general election abolishes the County Courts and provides for the transfer of their jurisdiction, powers, functions and duties, and provides in pertinent part: "Until otherwise provided by law, ... all surrogates shall become clerks of the Chancery Division (Probate Part)...." (emphasis supplied). By its very language the amendment makes clear that only an act of the Legislature can alter the status of the surrogate as a clerk of the Chancery Division.
Notwithstanding the specific language of the amendment and the failure of any legislative action, our Supreme Court created a new court by amending the court rules to refer to the Law Division, Probate Part. This rule does not and cannot diminish the jurisdiction of this court.
The plebiscite clearly mandates, and the amendment clearly envisions, the transfer of function of the Probate Court to the Chancery Court. There having always existed a Probate Part of the Chancery Division, the effect of the amendment was to centralize the functions and jurisdiction in the Chancery Division of the Superior Court.
Matters cognizable in Chancery are subject to the full panoply of equitable principles. The Legislature, which is the only body constitutionally authorized to assign probate to any court other than the Chancery Division, has not acted but has by its inaction permitted the exclusive jurisdiction of probate matters to be vested.
Since Probate is now exclusively a division of the Chancery Court, the constraints imposed by prior practice, if any, no longer apply. The doctrine of parens patriae, which vests this court with inherent powers over those incapable of protecting themselves, is now applicable in all its glory to incompetency proceedings.
*412 The movant argues that notwithstanding all of the above, this court may not act because Protective Services for the Elderly lacks standing to maintain this action. However, it is axiomatic that equity never permits a rigid principle of law to smother the factual realities to which it is sought to be applied. In equity you cannot tune out the relevant static and undertones. Equity adapts its relief to the requirements of a particular case. Grieco v. Grieco, 38 N.J. Super. 593, 598 (App.Div. 1956).
Additionally,
It is a universal rule of equity that where a person is not equal to protecting himself in a particular case, the court will protect him. As part of the inherent power of equity, a court of equity has full and complete jurisdiction over the persons of those who labor under any legal disability and also over their property. While the general control over such persons has very generally been transferred by statute to probate courts, it does not follow, unless the equity court has been definitely shorn of power, that equity jurisdiction thereover may no longer be exercised. Where legal disability of the individual is shown, the jurisdiction of the court is plenary and potent to afford whatever relief may be necessary to protect his interests and preserve his estates. The court's action in such a case is not limited by any narrow bounds, but it is empowered to stretch forth its arm in whatever direction its aid and protection may be needed. While this is indeed a special exercise of equity jurisdiction, it is beyond question that by virtue thereof the court may pass upon purely personal rights. [27 Am.Jur.2d, Equity, § 69 at 592 (1966).]
Far from divesting this court of power, the constitutional amendment places the Surrogate under the aegis of the Chancery Division and reinforces this court's inherent powers.
The people and the Legislature of this State have spoken. The court has been authorized to act. The days when a court of equity could only act on a command from a king have long since passed. There is no king to whom a person can apply for a sign manual. The Governor no longer acts as judge and Chancellor. The powers previously vested in the King and Governor have been inherited by this court. Thus, the Court of Chancery shall decide who has standing and who may institute incompetency proceedings. The court stands ready, willing and able to protect all people in accordance with the safeguards inherent in R. 4:83-1 et seq. The complaint for incompetency must be supported by affidavits of two qualified, reputable physicians, based *413 on a personal examination of the alleged incompetent not more than 20 days prior to the filing of the complaint. R. 4:83-2. Notice must be given to certain relatives and other interested persons. R. 4:83-4. If the alleged incompetent fails to appear at the hearing or appears without counsel, the court is required to adjourn the hearing and appoint counsel. R. 4:83-4. The alleged incompetent has a right to a jury trial upon demand. The determination of the issue of incompetency is made after taking testimony in open court. R. 4:83-6.
Additionally, guardians are required to post security. Thus, all of the reasons which previously existed for the requirement of standing are no longer viable, and it serves no beneficial purpose for judges in 1981 to quote principles enumerated by judges of prior centuries relevant to their circumstances but no longer applicable.
The court therefore holds that not only may the Protective Services for the Elderly petition this court, but any person may petition this court for the appointment of a guardian in the declaration of incompetency, because this court stands between the alleged incompetent and the person petitioning for the declaration, and stands ready to protect the incompetent to the end of time.