204 N.J. Super. 205 (1985)
497 A.2d 1298
IN THE MATTER OF D.K., AN ALLEGED MENTAL INCOMPETENT.
Superior Court of New Jersey, Chancery Division Burlington County.
April 11, 1985.
*210 John F. Kearney, III, as guardian for John/Jane Doe K., petitioner.
Emerson L. Darnell for D.K.
J. Patrick McShane, III for M.C.K. (Forkin, Eory and McShane, attorneys).
Neal Rosenberg for D.K. in commitment proceedings (Rosenberg and Rosenberg, attorneys).
Michael Sweeney, guardian ad litem for D.K. in matrimonial proceedings (Sweeney and Sweeney, attorneys).
HAINES, A.J.S.C.
D.K., suffering from schizophrenia, was committed to Ancora Psychiatric Hospital in the course of proceedings taken pursuant to the provisions of N.J.S.A. 30:4-23 et seq. and R. 4:74-7. There were indications that she was pregnant. Consequently, a guardian (an attorney) was appointed for the supposed fetus. The guardian, through the institution of a second suit, obtained an order from the committing judge restraining Ancora personnel from treating the mother with any medication potentially harmful to the fetus. The order also restrained D.K. from consenting to or requesting an abortion. The mother was represented in these proceedings by a court appointed attorney.
At the time of the commitment proceedings a divorce action was pending between D.K. and her husband who claimed that he was not the father of any child which she might bear. The paternity issue is pending.
The guardian of the fetus filed an additional suit in this court on January 8, 1985, seeking a declaration that D.K. was incompetent *211 in the sense that she could not manage her affairs, pursuant to N.J.S.A. 3B:12-24 et seq. and R. 4:83, and the appointment of a guardian for her. An attorney was appointed to represent her in these proceedings.
An incompetency hearing was conducted at Ancora. D.K. testified, challenging the competency of her doctors and denying her pregnancy. Prior to the hearing she told her doctors that she wanted an abortion, but refused to submit to a required physical examination which would determine whether she was pregnant. At the hearing, she said she was opposed to an abortion, while acknowledging the difficulties which the birth of a child would present. Three doctors testified. They were of the unanimous opinion that she was not capable of managing her affairs. Their opinions were based upon her history of schizophrenia, her ambivalence concerning an abortion, her denial of pregnancy and her unwillingness to have the medical examination which would determine her condition and permit her to make an appropriate decision as what she should do. D.K. disagreed with the doctors' opinions although acknowledging her history of schizophrenia. She was a somewhat difficult, though obviously very intelligent witness, whose personal, economic and legal difficulties were most distressing.
Her attorney and the guardian of the fetus participated in the hearing. The former questioned the standing of the guardian, claiming that his appointment was defective and that he was not entitled to file the incompetency complaint as a matter of law. The court reserved decision on these questions and proceeded with the hearing. The guardian was permitted to participate. The court also announced that it would pursue an alternative jurisdictional route, addressing the question of incompetency on its own motion, relying upon its inherent power to protect the interests of litigants who may be incompetent. The decision as to D.K.'s competency was reserved at the end of the hearing in the hope that a medical examination could be arranged which would confirm or deny the fact of pregnancy, a matter which would affect the responsibilities of the guardian *212 to be appointed for D.K., if that appointment was necessary. No satisfactory guardian was then available.[1]
An immediate decision was not in the interest of D.K. Before the decision could be reached D.K. was discharged from Ancora. The matrimonial and incompetency proceedings have been consolidated. D.K.'s attorney now moves for dismissal of the incompetency action. His motion is supported by his client's affidavit reflecting the fact of her discharge and asserting her competency. She admits that she is pregnant and says that she denied pregnancy at the Ancora hearing because she believed its doctors would force her to have an examination which she did not want and might force her to have an abortion. She has no wish now to have an abortion. The motion asserts her competence and challenges again the right of the fetus to be represented and the standing of its guardian to file the incompetency complaint. The court holds that the appointment of the guardian for the fetus was improper and that he had no standing to institute any action; it proceeds, however, with a determination of the incompetency issue. The reasons are set forth in this opinion.

I.

The Guardian of the Fetus
In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the United States Supreme Court decided that the right of a woman to have an abortion during the first trimester of her pregnancy was fundamental. The decision to abort was one to be reached by the woman and her physician; it was not subject to regulation by the state. The right to make that decision is part of the constitutional right of privacy. It may be exercised during the second trimester, subject to the right of *213 the state to adopt appropriate regulations designed to protect the health of the mother, a subject as to which the state is said to have a compelling interest. The state, however, does not then control the abortion decision. When the fetus becomes viable, between the 24th and 26th weeks, according to the Court's calculations, the state has a compelling interest in potential human life and may regulate or proscribe abortion, except when necessary for the preservation of the mother's life or health. Our New Jersey Constitution provides like rights. N.J. Const. (1947), Art. I, par. 1; Right to Choose v. Byrne, 91 N.J. 287 (1982).
This is the law today. The right of privacy recognized by our courts remains intact. Its fundamental nature was recognized in Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), in the following language:
If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. [at 453, 92 S.Ct. at 1038]
Thus, it is the mother who controls the fetus, until viability occurs, not the reverse. That control is a constitutional right. If the mother is incompetent, control must be exercised through a guardian. In re Grady, 85 N.J. 235, 250-251 (1981). The appointment of a guardian for the fetus, prior to its viability, is therefore improper. Such an appointment permits a third person to control the fetus, contrary to Roe v. Wade. In Rothenberger v. Doe, 149 N.J. Super. 478 (Ch.Div. 1977), plaintiff argued for the appointment of a guardian ad litem to assert a fetus' right to life. The court said:
This aspect of the case must be dismissed immediately since it has been determined conclusively by the United States Supreme Court that `the unborn have never been recognized in the law as persons in the whole sense' and that during the first trimester of pregnancy a decision may be reached and effectuated to abort the fetus, free of any interference by the State.
[At 479; citations omitted]
The guardian for the fetus was appointed on December 14, 1984. The best available evidence, an opinion of a physician *214 eventually consulted by D.K. with the assistance of her attorney, indicates that she was then only eight to ten weeks pregnant.[2] At the time the guardian was appointed, therefore, the fetus could not have been viable and the appointment was unconstitutional and void.
A further problem with the appointment lies in the fact that our rules make no provision for it. R. 4:74-7 provides for civil commitment procedures and authorizes the appointment of a guardian ad litem and an attorney for a "minor"; there is no reference to a fetus. R. 4:26-2(b)(4) states: "The court may appoint a guardian ad litem for an infant or alleged incompetent person on its own motion." The reference to "person" is significant. A fetus is not a person. In Roe v. Wade, the Court said that "the word `person,' as used in the Fourteenth Amendment, does not include the unborn." 410 U.S. at 158, 93 S.Ct. at 729.

II.

Standing
R. 4:83 governs actions for the guardianship of incompetents. It requires the complaint to "state the name, age, domicile and address of the plaintiff, his relationship to the alleged incompetent, his interest in the action." In re Tierney, 175 N.J. Super. 614 (Law Div. 1980), aff'd 177 N.J. Super. 245 (App.Div. 1981), traced the history of this rule and concluded that a plaintiff must be a relative, or a creditor or must exhibit a relationship based upon contract, trust or confidence. A "mere stranger" cannot bring an action. See also In re Schiller, 148 N.J. Super. 168 (Ch.Div. 1977). But see In re Bennett, 180 N.J. Super. 406 (Law Div. 1981) (Apparently decided before the *215 Appellate Division addressed In re Tierney). It is therefore clear that the guardian for the fetus had no standing to file the incompetency action. Since his appointment was not proper, he had no authority to sue. This aside, he met none of the criteria set forth in Tierney.
The guardian argues that since he was appointed by another judge in another proceeding, an appointment which has not been appealed, this court has no authority to set the appointment aside. The argument is not persuasive. This court is not bound by the decision of another court on the same level. Furthermore, the appointment was unconstitutional and void; it may be challenged at any time. United N.J.R. & Canal Co. v. Parker, 75 N.J.L. 771 (E. & A. 1908).
It must be observed, also, that the court which appointed the guardian of the fetus had no in personam jurisdiction for that purpose. The fetus was not a person, Roe v. Wade, supra, so that such jurisdiction could not have been obtained. "The jurisdiction of a court  `its right to speak'  is its right, or rather its power, to pronounce a particular final judgment or decree as to a particular person in a particular action.... Jurisdiction over the person of a defendant, in a civil suit, is acquired by service of the court's process upon him." In re Hall, 94 N.J. Eq. 108 (Ch. 1922). A judgment purely in personam without actual service of process is coram non judice. Whalen v. Young, 15 N.J. 321 (1954).
The guardian points to R. 4:26-3(c) which authorizes the appointment of a guardian ad litem in "an action in which the interests of a person not in being are or may be affected or in which it is not known or is difficult to ascertain who is the person or class affected thereby." No case has applied this rule to a fetus for present purposes, or otherwise. If it is intended to so apply, it is contrary to Roe v. Wade and unconstitutional. That cannot have been the intention of the Supreme Court in adopting the rule. American Trial Lawyers Ass'n v. *216 N.J. Supreme Court, 126 N.J. Super. 577, 589 (App.Div.), aff'd 66 N.J. 258 (1974).
For all of these reasons the appointment of the guardian must be set aside; he cannot participate further in any of these consolidated proceedings.

III.

The Power of the Court to Address the Competency Issue

A. The Facts

This court cannot be blind to the facts brought to its attention by these proceedings simply because the person who started them had no standing to do so. The proceedings assert D.K.'s incompetency. The affidavits of two physicians attached to the complaint confirm that fact and point to her long psychiatric history. D.K.'s husband has filed an affidavit supporting his contention that she is incompetent. The court knows of the commitment proceedings which resulted in D.K.'s Ancora placement. It also knows that D.K. is involved in complicated divorce proceedings. The divorce litigation involves the custody of two children, equitable distribution and other issues. D.K. has no money, no helpful relatives or none acceptable to her or the court, and upon her release from Ancora has been obliged to live with her husband because she had no alternative. Her personal problems obviously affect her ability to advance her interests in the ongoing proceedings.
The risks she faces are vividly illustrated by the unconstitutional orders to which she has been subjected. A guardian, appointed for the fetus in the course of her commitment proceedings, promptly filed a separate suit in which he secured an order restricting her right to an abortion and invading the medical province of D.K. and her doctors, an order which made a choice between D.K., a person, and her fetus, a nonperson, favoring the latter. Thus, control over her body was given to the guardian of the fetus and taken away from her.
*217 In view of these circumstances, the obligation of the court to take appropriate action for D.K.'s protection is clear. That factual clarity, however, is by no means matched by the provisions of our rules and statutes or by the holdings of our courts in the few cases which have addressed the issue. Difficult questions are raised as to the power of this court to adjudicate D.K.'s incompetency and, if she is incompetent, to appoint a guardian to manage her affairs.
Only a limited group of plaintiffs have standing to commence incompetency proceedings. There are good reasons for this. In re Tierney explains:
The public policy which gave birth to the standing requirements as to incompetency actions is clearly to protect individuals from unwanted interference in their affairs; to shield an individual from the necessity of defending himself or herself from frivolous or insidious incompetency charges. It is the opinion of this court that a general need for such protection has not diminished.... [175 N.J. Super. at 623]
Notwithstanding this entirely correct statement of public policy, this court concludes that it is not only empowered, but is required, to adjudicate D.K.'s incompetency in the present setting. The following analysis of the rules, statutes and cases dealing with the problem justifies this conclusion.

B. Statutes, Rules and Cases

The statutory authority for incompetency proceedings is concise. N.J.S.A. 3B:12-24 simply states that:
In civil actions or proceedings for the determination of mental incompetency or for the appointment of a guardian for an alleged mental incompetent, the trial of the issue of mental incompetency may be had without a jury pursuant to Rules Governing the Courts of the State of New Jersey, unless a trial by jury is demanded by the alleged mental incompetent or some one on his behalf.
N.J.S.A. 3B:12-25 provides in part that:
The Superior Court may determine the mental incompetency of an alleged mental incompetent and appoint a guardian for his person, guardian for his estate or a guardian for his person and estate.
These statutes establish no restrictions upon the ability of the court itself to undertake incompetency proceedings.
*218 The only other statute providing courts with authority over incompetents is N.J.S.A. 30:4-82, which authorizes a court "in an action like an action for commitment" to determine the mental condition of "any person in confinement under commitment, indictment, or sentence, or under any process" when such person "shall appear to be mentally ill or mentally retarded." This statute gives courts sua sponte authority to determine the mental condition of a party but is limited to persons who are confined or under indictment.
The guardian for the fetus in this matter filed his complaint under R. 4:83. That rule sets forth the information which must be included in a complaint for the determination of mental incompetency including requirements for physicians' affidavits, notice, hearing and judgment. It does not place any restrictions upon the identity of plaintiff nor does it contain any provision concerning a determination of incompetency by the court, acting on its own. The opposite is true, however, with respect to the appointment of a guardian ad litem pursuant to R. 4:26-2(b)(4) which states: "The court may appoint a guardian ad litem for an infant or an alleged incompetent person on its own motion." The same rule also provides, in subparagraph (a):
... an infant or incompetent person shall be represented in an action by the guardian of either his person or his property, appointed in this State, or if no such guardian has been appointed or a conflict of interest exists between guardian and ward or for other good cause, by a guardian ad litem appointed by the court in accordance with paragraph b of this rule.
Incompetent persons may be committed to an institution pursuant to the provisions of N.J.S.A. 30:4-23 et seq. and R. 4:74-7. It was under these provisions that D.K. was sent to Ancora. The test for commitment, however, was not, as here, whether she was unable to manage her affairs, but rather whether she would be a danger to herself or others or to property if not confined and treated. Neither the statute nor the rule restricts the identity of the person making the application for an order of commitment and nothing is said as to the power of the court to proceed with a commitment on its own.
*219 It is the decisions of courts which have restricted the class of plaintiffs who may commence incompetency proceedings. These decisions follow.
In re Tierney involved a suit seeking a declaration of incompetency. It was a suit commenced by a childhood friend who held the alleged incompetent's power of attorney, controlled her assets and was the principal beneficiary of her will. She was not, however, otherwise related. The court held that the plaintiff had no standing to bring the action. It said:
Plaintiff in the instant case is neither relative nor creditor nor does she have with Ms. Tierney a relationship based on contract, trust or confidence. Plaintiff is a "mere stranger" to the person whom she is seeking to have declared incompetent.
....

R.R. 4:102-1 [now R. 4:83], part of the then court rules to which the statute referred, required that the complainant in an incompetency proceeding state his relationship to the alleged incompetent and, if not spouse or next of kin, his interest. Obviously, such requirement reflects and substantiates the general rule that a proper complainant must be a relative or a person with a legal or equitable interest in the subject of the action. The court is persuaded that the Legislature and our Supreme Court intended by way of N.J.S.A. 3A:6-35 [now N.J.S.A. 3B:12-24] and R.R. 4:102-1, to continue those standing restrictions that had been followed since pre-revolutionary times [Id., 175 N.J. Super. at 620, 622]
Tierney recognized possible difficulties with its ruling:
One can imagine that there are instances where a person with no family, who cannot manage to take care of himself or herself, might be denied by the standing requirements the benefits of a guardian's assistance and the assurance of proper care. The instant case, however, does not present such a situation. Jane Tierney is institutionalized; presumably she is adequately cared for. She has sufficient assets to provide for her continued institutionalization if that is necessary. She has made arrangements with her attorney to set up an inter vivos trust which would insure her future maintenance in any case. In no sense is the court, in dismissing this incompetency action, "abandoning" Ms. Tierney or denying her proper care [Id. at 623-24; citation omitted]
The court relied in part upon In re Oswald, 132 N.J. Eq. 325 (Ch. 1942), which held that a stranger had no standing to bring a suit for a declaration of incompetency. The Oswald court said:

*220 Since the Chancellor's power with respect to lunatics is based solely upon statute, it may not be extended in the same manner as the Chancellor strictissimi juris enlarges the inherent jurisdiction of the Court of Chancery whenever equity so demands it. [at 327]
It also noted:
Neither the English Parliament before the American Revolution nor the New Jersey legislature since that time has granted to the Chancellor the power to issue a writ de lunatico inquirendo upon the application of a mere stranger and no such practice has heretofore been countenanced. [at 329]
It was argued that the court itself, having had knowledge of the facts concerning the alleged incompetent's condition, was obliged to undertake a formal inquiry, adjudicate incompetency and appoint a guardian. The court declined to address this issue on the ground that the only question before it was "whether petitioner as a stranger may institute these proceedings." Id. at 332.
In re Rhodes, 100 N.J. Eq. 370 (Ch. 1927), involved incompetency proceedings commenced by an alleged incompetent's daughter. The daughter requested a dismissal of the proceedings. The Chancellor declined to do so. He held:
The chancellor is general guardian of all infants, idiots and lunatics, and when they are brought before the court the jurisdiction parens patriae obtains, and they are wards of court. And the petitioner may not dismiss the proceedings to the detriment of a lunatic, who is a ward of court, without the chancellor's consent, and he will not consent unless it is for the best interest of the lunatic so to do. In this case the alleged lunatic's interest requires that the cause be proceeded with. [at 373; citation omitted]
In re Bennett, 180 N.J. Super. 406 (Law Div. 1981), disagreed with Tierney's standing rules, apparently unaware of the Appellate Division's affirmance of those rules. It held that "as a matter of law ... there are no special rules of standing governing incompetency proceedings. General principles of standing therefore apply." Id. at 410. It could have distinguished Tierney factually. The incompetent in Bennett was found wandering the streets; the proceedings were commenced by a welfare agency.
An incompetent's need for medical services may justify the appointment of a "special guardian" for the purpose of *221 consenting to surgery. In re Schiller, 148 N.J. Super. 168 (Ch.Div. 1977). In that case, an amputation was required in order to save the life of a hospital patient who was mentally incapable of consenting to the operation. A cousin was appointed special guardian with authority to provide that consent. The court relied upon Barnert Memorial Hosp. Ass'n v. Young, 63 N.J. 578 (1972), in which the court affirmed a similar appointment. The Barnert opinion, being only three paragraphs in length, provides but modest illumination. It makes no reference to a "special guardian." Neither do our rules.
Schiller anticipated the standing rule of Tierney (citing Oswald), in a footnote, stating: "The complainant must be a relative, creditor, or perhaps have a relationship founded upon contract, trust or confidence but a stranger may not." 148 N.J. Super. at 179, n. 3. The standing of the hospital was not discussed. It may have been a creditor, or it may have had a "relationship founded upon contract, trust, or confidence." (It may have had a conflict of interest as well, a question not discussed.) The court nevertheless recognized the difficulties caused by the standing limitations: "Unfortunately, in many cases today involving older persons there is no apparent family and there is a substantial question as to who in such circumstances may make an application." Ibid.
Schiller's other observations underline the present problem. For example: "In the absence of a proper plaintiff and supporting affidavits, a court has no inherent power to determine mental incompetency. Its jurisdiction in such matters is purely statutory and hence a court has no inherent power to expand it." Id. at 180, n. 4, citing Oswald.
In its final analysis, Schiller relied upon its parens patriae jurisdiction. It held that, if either the fact of a patient's disability, in the sense of legal status, or the fact that the patient lacked mental capacity to consent, is established "a court has power to appoint a `special guardian' under the *222 parens patriae jurisdiction." Id. at 177. This jurisdiction is described in In re Grady, 85 N.J. 235 (1981), in which it was held that our courts, exercising "inherent parens patriae jurisdiction," could consent to the sterilization of an incompetent 19-year-old woman. The court appointed her parents general (not special) guardians to provide the consent. It said:
The parens patriae power of our courts derives from the inherent equitable authority of the sovereign to protect those persons within the state who cannot protect themselves because of an innate legal disability. While traditionally used to protect the economic and property interests of the legally disabled, it has also been invoked to protect personal rights. In divorce and child custody cases, for example, our courts exercise parens patriae jurisdiction to protect the best interests of children. The chancery courts also utilize their parens patriae powers when a juvenile has committed a criminal offense, or when a person has been committed to a psychiatric institution. [at 259; citations omitted]
The Grady decision turned upon the constitutional right of privacy, held to include the right of a 19-year-old woman to be sterilized and to have guardians appointed who could provide her consent to that procedure when she was incompetent to do so. The parallel with the present case is obvious. D.K. has a constitutional right, not only to defend herself with respect to the litigation in which she is involved and to take affirmative positions with respect thereto, but also, for example, to decide whether she should have an abortion prior to the third trimester of her pregnancy. If she is incompetent and therefore unable to make such decisions, the constitutional right of privacy entitles her to have a guardian appointed to provide a substituted decision or consent. If no guardian can be appointed, because no proper plaintiff has appeared to institute these proceedings, it is obvious that D.K.'s constitutional rights will never be exercised.
In In re Quinlan, 70 N.J. 10 (1976), quoting from the trial court's opinion, 137 N.J. Super. 227, 254 (Ch.Div. 1975), the Court said:
As part of the inherent power of equity, a Court of Equity has full and complete jurisdiction over the persons of those who labor under any legal *223 disability.... The Court's actions in such case is not limited by any narrow bounds, but it is empowered to stretch forth its arm in whatever direction its aid and protection may be needed. While this is indeed a special exercise of equity jurisdiction, it is beyond the question that by virtue thereof the court may pass upon purely personal rights. [70 N.J. at 44-45]
See also Johnson v. State, 18 N.J. 422, 430 (1955).
The appointment of a guardian ad litem, which may be made by the court on its own motion, is sufficient to protect the interests of an incompetent with respect to litigation in which she is a party. However, the powers of a guardian ad litem are limited. "[W]here the effect [of the appointment] is to restrain an allegedly incompetent person of his liberty or deprive him of control of his property and the management of his personal affairs," an incompetency proceeding under R. 4:83 is necessary. In Re Commitment of S.W., 158 N.J. Super. 22, 26 (App.Div. 1978); East Paterson v. Karkus, 136 N.J. Eq. 286, 288 (Ch.Div. 1945). D.K., in the present setting, needs more than a guardian ad litem. The matrimonial proceedings, for example, have involved motions seeking her execution of income tax returns and the extension of a loan contract.

IV.

The Instant Case Distinguished; the Open Question
The facts of the present case are not the facts addressed in Tierney, Oswald, Rhodes, or Schiller and those cases may be distinguished on that basis. A factual distinction, however, is not necessary. Tierney recognized that "there are instances where a person with no family, who cannot manage to take care of himself or herself, might be denied by the standing requirements the benefits of the guardian's assistance and the assurance of proper care." 175 N.J. Super. at 623-24. Schiller expressed concern about the many cases involving persons with "no apparent family" and saying "There is a substantial question as to who in such circumstances may make an application." 148 N.J. Super. at 170, n. 3. Oswald declined the opportunity to *224 decide the instant question. In Rhodes, the Chancellor refused to dismiss an incompetency proceeding once it had been started because it would not have been in the interest of the incompetent, indicating support for the conclusion made by this court in this case. Thus, the cases which established standing limitations left for resolution the question of who may proceed when no appropriate plaintiff is available. None of the cases cited addressed the question of whether the court itself could and should proceed.
Schiller is the only court stating expressly, though in dicta, that a court "has no inherent power to determine mental incompetency. Its jurisdiction in such matters is purely statutory and hence a court has no inherent power to expand it." Id. at 180, n. 4. Nevertheless, the court found the power, based upon the parens patriae doctrine, to appoint a "special guardian" for an incompetent on the application of a hospital.
The decisions in Grady and Quinlan, based upon the parens patriae doctrine, underline the inherent power which courts do have with respect to incompetency proceedings. The only difference between those cases and the present one, in terms of jurisdiction, is the existence of relatives who were plaintiffs. That difference, if controlling here, would permit form to rule substance. It was the court which decided, in Grady, that sterilization could be provided and, in Quinlan, that life support systems could be disconnected. Guardians were appointed for the purpose of deciding whether the consent which the court authorized should be given. Here, the court is deciding a similarly significant issue, namely, whether D.K. is incompetent, and is doing so after all safeguards  notice, hearing and representation  have been provided. The lack of a technically qualified plaintiff cannot prevent this court from acting in the interest of an incompetent. Its exercise of parens patriae jurisdiction is appropriate and is authorized by the holdings of Grady and Quinlan.
*225 It may be argued in any event that this court meets the Tierney standing test. It has a relationship with D.K. founded upon "trust or confidence" and also has an "equitable interest in the subject of the action." It is bound to protect incompetent litigants who appear before it. Cohen v. Cohen, 78 N.J. Super. 365, 374 (App.Div. 1963). That obligation creates a relationship more significantly trustworthy than any other that could be found in present circumstances. It is a relationship, for example, providing more reliable standing than that of a creditor whose interest is not in the alleged incompetent but rather in the collection of a debt and who, therefore, has a conflict of interest.

V.

The Incompetency Conclusion
No court properly exercising its powers, having received facts or observed actions which indicate that a litigant may be incompetent, can proceed without the assurance that such a litigant is able to manage his or her affairs. Cohen v. Cohen, supra. Were this not so, that court would be countenancing a possible miscarriage of justice, thereby defeating the very purpose of our court system.
In the present case the court is fully aware of D.K.'s disabilities. It knows that she has been committed to Ancora. It has received the affidavits of two physicians stating that she is incompetent to manage her affairs by reason of her schizophrenic condition. A guardian ad litem has been appointed for her in the divorce proceedings. This is far more than enough to require the court to notice her possible incompetency and to take such proceedings as are necessary to determine that fact so that safeguards can be erected for her protection. No other action satisfies the court's parens patriae jurisdiction and obligation.
*226 Consequently, the incompetency proceeding should not and will not be dismissed. It will continue on the basis of the sua sponte exercise of this court's parens patriae jurisdiction. State v. Spivey, 65 N.J. 21, 37 (1974). (A court may sua sponte hold a hearing as to the competency of a criminal defendant to stand trial.) The testimony received clearly supports the conclusion that D.K. is ill and cannot manage her affairs. That was the unanimous conclusion of the medical experts. It is corroborated by the history of schizophrenia, the pregnancy difficulties and the complexities to which she is subject as a result of this litigation.
The fact of D.K.'s release from Ancora does not affect this conclusion. It comes after the hearing. This decision must be made as of the hearing date, February 11, 1985. Further, the test to be satisfied in order to justify an involuntary commitment to Ancora is the likelihood that the alleged incompetent poses a danger to herself or others or to property by reason of mental illness. State v. Krol, 68 N.J. 236, 257 (1975); R. 4:74-7(f). Clear and convincing evidence must be produced for that purpose. In re S.L., 94 N.J. 128, 137 (1983). The test for a declaration of incompetency in an R. 4:83 proceeding is different. That test requires an adjudication by the court that "the alleged incompetent is unfit and unable to govern himself or herself and to manage his or her affairs." In re Commitment of S.W., 158 N.J. Super. 22 (App.Div. 1978); Perrine's Case, 41 N.J. Eq. 409, 411 (Ch. 1886).
The facts here dictate the conclusion that D.K. was unable to manage her affairs on February 11, 1985, and must therefore be declared incompetent in that sense. A guardian must be appointed for her. She is not without some capacity but cannot successfully deal with the very substantial difficulties involving her marriage and her family without a representative empowered to act for her.
*227 The fact of D.K.'s release from Ancora and her own insistence upon her competence do require a prompt hearing to determine whether, in fact, she has returned to competency since February 11, 1985. Under R. 4:83-7 the determination must be made after the taking of "oral testimony in open court." A prompt hearing date will be fixed for this purpose.

VI.

Other Matters
It is apparent, in view of the above reasoning, that the restraints against providing D.K. with medication or an abortion were improvidently granted. They were designed to protect a non-viable fetus at the possible expense of the mother. This is not permissible under Roe v. Wade. The restraints must be vacated.
It is also apparent that the fetus will soon be viable. If, in the future, these consolidated proceedings may adversely affect its interests, the court may find it necessary, sua sponte, or upon application of a party or other proper person, to appoint a guardian ad litem to protect the interest of the fetus. At the present time, the need for such an appointment is not apparent.

VII.

Counsel Fees
The guardian of the fetus requests the allowance of fees. He has been extremely diligent on behalf of the fetus. His exemplary services to the court must be acknowledged. Unfortunately, however, there is no authority which allows fees to be paid to an appointee whose appointment is void. A void agreement must be regarded as one never made. Consequently, the fee application must be denied.
NOTES
[1] D.K.'s attorney tried to enlist a sister's help. She hung up the telephone before he could finish his conversation. D.K.'s mother, who lives in Chicago, came East, willing to act as guardian; D.K. refused to cooperate. D.K.'s husband is an adversary. Her children are too young to act.
[2] The opinion was not available for some time because D.K. directed the physician not to release the results of his examination to anyone, including her attorney.